# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP1523 |
| COMPLETE TITLE: | Vincent Milewski and Morganne MacDonald, Plaintiffs-Appellants-Petitioners, v. Town of Dover, Board of Review for the Town of Dover and Gardiner Appraisal Service, LLC as Assessor for the Town of Dover, Defendants-Respondents. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 370 Wis. 2d 262, 881 N.W.2d 359
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 7, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 19, 2017 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Racine |
| JUDGE: | Phillip A. Koss |

| JUSTICES: | |
|---|---|
| CONCURRED: | ROGGENSACK, C.J. concurs (opinion filed). ZIEGLER, J. concurs, joined by GABLEMAN, J. (opinion filed). |
| DISSENTED: | ABRAHAMSON, J. dissents, joined by A.W. BRADLEY, J. (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiffs-appellants-petitioners, there were briefs filed by *Richard M. Esenberg*, *Brian W. McGrath*, *Thomas C. Kamenick*, and *Wisconsin Institute for Law & Liberty*, Milwaukee, and oral argument by *Richard M. Esenberg.*

For the defendants-respondents Town of Dover and Board of Review for the Town of Dover, there was a brief filed by *Dustin T. Woehl*, *Jason P. Gehring*, and *Kasdorf Lewis & Swietlik*, *SC*, Milwaukee, and oral argument by *Jason P. Gehring.*

For the defendant-respondent Gardiner Appraisal Service, LLC, there was a brief filed by *Mitchell R. Olson* and *Axley Brynelson, LLP*, Madison, and oral argument by *Timothy M. Barber*.

An amicus curiae brief was filed on behalf of Institute for Justice by *Lee U. McGrath and Meagan A. Forbes* and *Institute for Justice*, Minneapolis.

An amicus curiae brief was filed on behalf of Wisconsin REALTORS® Association by *Thomas D. Larson* and *Wisconsin REALTORS® Association,* Madison.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2015AP1523
(L.C. No.  2014CV1482)

STATE OF WISCONSIN                   :        IN SUPREME COURT

Vincent Milewski and Morganne MacDonald

        Plaintiffs-Appellants-Petitioners,                    **FILED**

    v.

                                                          **JUL 7, 2017**

Town of Dover, Board of Review for the Town of
Dover, and Gardiner Appraisal Service, LLC, As          Diane M. Fremgen
Assessor for the Town of Dover,                      Clerk of Supreme Court

        Defendants-Respondents.

---

        REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

        ¶1   DANIEL KELLY, J.   Vincent Milewski and Morganne MacDonald (collectively, the "Milewskis") own a home in the Town of Dover.   They want to challenge a tax assessor's recent revaluation of their property.   But they also want to prevent the tax assessor from inspecting the interior of their home as a part of that process.   The Town says our statutes require them

to pick one or the other because they cannot do both.[1]  The Milewskis ask us whether the Town can put them to this choice.[2]

## I.  BACKGROUND

¶2  The Milewskis bring us a discrete question, but we see that the answer will play out against an intricate and delicately balanced set of tax statutes and constitutional provisions.  Although the following background provides little more than a broad sketch of Wisconsin's system of real property taxation, it should be enough to place the Milewskis' question in an understandable context.

### A. Wisconsin's tax assessment scheme

¶3  Article VIII, section 1 of the Wisconsin Constitution, known as the Uniformity Clause, requires the uniform taxation of real property,[3] and Wis. Stat. ch. 70 provides the general

---

[1] We will collectively refer to all the respondents as the "Town," unless the context requires otherwise.

[2] We review the unpublished decision of the court of appeals, Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op. (Wis. Ct. App. May 4, 2016), affirming the Racine County circuit court's order dismissing the Milewskis' claims (the Honorable Phillip A. Koss, presiding).

[3] The Uniformity Clause provides that:

The rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods.  Taxes shall be levied upon such property with such classifications as to forests and minerals including or separate or severed from the land, as the legislature shall prescribe. Taxation of agricultural land and undeveloped land, both as defined by law, need not be uniform with the taxation of each other nor with the taxation of other

(continued)

procedure by which municipalities carry out this duty.    In Wisconsin, "[r]eal property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under [Wis. Stat. § 73.03(2a)] from actual view <u>or</u> from the best information that the assessor can practicably obtain . . . ."    Wis.  Stat.  § 70.32(1)  (2015-16)[4]  (emphasis added).    The Wisconsin Property Assessment Manual provides that "[i]n the case of real property, actual view requires a detailed viewing of the interior and exterior of all buildings and improvements and the recording of complete cost, age, use, and accounting  treatments."    Wis.  Dep't  of  Revenue,  <u>Wisconsin Property Assessment Manual</u>, 10-55 (2017).

¶4    If  the  property  owner  is  dissatisfied  with  the assessor's valuation, he may bring his objection to the local

---

real property.  Taxation of merchants' stock-in-trade, manufactures' materials and finished products, and livestock need not be uniform with the taxation of real property and other personal property, but the taxation of all such merchants' stock-in-trade, manufacturers' materials and finished products and livestock shall be uniform, except that the legislature may provide that the value thereof shall be determined on an average basis.  Taxes may also be imposed on incomes, privileges and occupations, which taxes may be graduated and progressive, and reasonable exemptions may be provided.

Wis. Const. art. VIII, § 1.

[4] All subsequent references to the Wisconsin statutes are to the 2015-16 version unless otherwise indicated.

board of review. Wis. Stat. § 70.47(7)(a).[5] He may do so, however, only after he has first allowed a tax assessor to view his property:

> No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.

Wis. Stat. § 70.47(7)(aa). At the board of review hearing, the owner may present evidence in support of what he believes to be the proper valuation. Wis. Stat. § 70.47(8). Based on that evidence, the board of review decides whether to adjust the assessor's valuation. Wis. Stat. § 70.47(9)(a). If the owner disagrees with the board of review's conclusion, he may seek certiorari review by the circuit court. Wis. Stat. § 70.47(13).

¶5 Some property owners, however, may want a circuit court, rather than the town's board of review, to make the initial determination of whether the assessor's valuation is accurate. Such an owner may file a claim for excessive assessment in the circuit court under Wis. Stat. § 74.37(2). He must still, however, follow the pre-hearing procedures for challenging the valuation before the board of review, as outlined above: "No claim or action for an excessive assessment may be brought under this section unless the procedures for

---

[5] Each town creates its own board of review. The town's common council decides who sits on the board, but the members typically include the mayor, town clerk, and such other officers as the council should designate. See Wis. Stat. § 70.46(1).

objecting to assessments under [§] 70.47 . . . have been complied with." Wis. Stat. § 74.37(4)(a). After completing these pre-hearing procedures, the owner asks the board of review for a hearing waiver. Wis. Stat. § 70.47(8m). Once granted, the owner may file his complaint in the circuit court.

B. The Town of Dover Revalues the Milewskis' Property

¶6 In 2013, the Town of Dover reassessed all the properties in its jurisdiction and contracted with Gardiner Appraisal Service, LLC ("Gardiner") to assign a value to each such property. Gardiner's attention eventually turned to the Milewskis' home (the "Property"), which had a pre-2013 assessed value of $273,900, and an estimated fair market value of $277,761. Gardiner sent the Milewskis a notice stating that it "must view the interior of your property for the Town wide revaluation program which is in progress" and that "[a]n assessor will stop to view your property on Tues, Aug 20 at 6:10 pm."

¶7 When the assessor arrived, Ms. MacDonald invited him into their yard and told him he was welcome to view the Property's exterior; however, she further informed him he would not be allowed inside the home. The assessor declined Ms. MacDonald's invitation to view the Property's exterior and left without asking her any questions about the Property.

¶8 A few months later, the Milewskis received a certified letter from Gardiner stating that the assessor had not "viewed the interior of your buildings" and asked that they schedule a time for him to do so. The Milewskis sent the Town a letter

objecting to the requested interior inspection. Gardiner made no further attempt to view the interior of the Property and assessed it at a value of $307,100——a 12.12 percent increase from the previous assessment of $273,900.[6]

¶9 After learning of the new assessment, Mr. Milewski attended open book sessions to review the assessed values of other properties in the subdivision.[7] Based on his research, Mr. Milewski learned that of the 43 parcels in the subdivision, only four properties, including the Milewskis', did not have their interiors inspected during the 2013 assessment. Of those four properties, all four saw an increase in their initial assessment. The other 39 properties that did have their interiors inspected saw their assessed value decrease. After receiving the initial assessments, the owners of two of the four properties that had not had their interiors inspected allowed Gardiner to conduct an inspection of their home's interior and the assessments for those properties were then reduced. Thus, the only two properties in the 43-parcel subdivision that saw an increased assessment during the 2013 revaluation were those two properties where the owners did not consent to Gardiner's view of their home's interior.

---

[6] The percentages we use throughout this opinion are those reflected in the amended complaint.

[7] Once the assessor has recorded the assessed values of the town's property on the assessment rolls, the town clerk makes the rolls available for public inspection during what is known as "open book sessions." Wis. Stat. § 70.45.

C. The Milewskis Protest the Revaluation of the Property

¶10 The Milewskis filed an "Objection Form for Real Property Assessment" with the Town, and about two weeks later, they appeared at the November 25, 2013 Dover Board of Review ("BOR") hearing, where they intended to object to the assessment of their Property. However, because the BOR determined they had refused "a reasonable request by certified mail of the assessor to view [their] property," the BOR refused to hear their objection.

¶11 The Milewskis paid their 2013 property taxes and filed a Notice of Claim and Claim with the Town Clerk under Wis. Stat. § 74.37, alleging the Property assessment was excessive and that the Town had violated their Fourth Amendment rights. The Town denied the Milewskis' claim by taking no action on it within 90 days. See Wis. Stat. § 74.37(3)(a). The Milewskis later followed the same procedure for their 2014 property taxes, with the same result.

¶12 The Milewskis commenced this case with a complaint that included a claim for excessive assessment under Wis. Stat. § 74.37, and a claim that Wis. Stat. § 70.47(7)(aa) and Wis. Stat. § 74.37(4)(a), as applied to the Milewskis, are unconstitutional because they conditioned their right to challenge the assessor's valuation of the Property on submission to a search of their home. The parties filed cross-motions for summary judgment. The circuit court granted the Town's, the BOR's, and Gardiner's motions and dismissed the Milewskis'

7

claims. The court of appeals affirmed the circuit court, and we granted the Milewskis' petition for review.

## II. STANDARD OF REVIEW

¶13 Summary judgment is appropriate when there are no genuine disputes as to any material facts and the moving party is entitled to judgment as a matter of law. See Wis. Stat. § 802.08(2). We review a grant of summary judgment de novo, applying the same methodology as the circuit court. Belding v. Demoulin, 2014 WI 8, ¶13, 352 Wis. 2d 359, 843 N.W.2d 373. While our review is independent from the circuit court and court of appeals, we benefit from their analyses. See Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶16, 360 Wis. 2d 129, 857 N.W.2d 136.

¶14 A facial challenge to a statute's constitutionality also presents a question of law that we review de novo. Aicher v. Wis. Patients Comp. Fund, 2000 WI 98, ¶18, 237 Wis. 2d 99, 613 N.W.2d 849. We presume statutes are constitutional; the party asserting the constitutional infirmity must establish its argument beyond a reasonable doubt. State v. Wood, 2010 WI 17, ¶15, 323 Wis. 2d 321, 780 N.W.2d 63.

¶15 The Milewskis say they are not contesting the constitutionality of the statutes in question, only how they were applied to them. In such a challenge there is no presumption the statute has been applied in a constitutional manner. In re Gwenevere T., 2011 WI 30, ¶48, 333 Wis. 2d 273, 797 N.W.2d 854 ("neither party faces a presumption that the statute was constitutionally applied."). We assume the

8

constitutionality of the statutes, and require the challenger to prove the unconstitutional application of the statutes beyond a reasonable doubt. Soc'y Ins. V. LIRC, 2010 WI 68, ¶27, 326 Wis. 2d 444, 786 N.W.2d 385; In re Gwenevere T., 333 Wis. 2d 273, ¶47 (In an "as-applied" challenge, "the presumption that the statute is constitutional applies, just as it does in a facial challenge.").

### III. DISCUSSION

¶16 The Milewskis understand themselves to be on the horns of a dilemma. The Town told them they must either submit to a tax assessor's inspection of the interior of their home or lose the right to challenge the revaluation of their Property. The Milewskis say the Town may not make them ransom their due process rights with a search of their home. The Fourth and Fourteenth Amendments, they say, protect the sanctity of their home as well as their right to contest the Town's revaluation.[8] Put to the choice between the two, the Milewskis opted not to allow the tax assessor's inspection. So the Board of Review refused to hear their challenge.

¶17 The Town sees no dilemma. Instead, it sees only a polite request to enter a home to perform the reasonable task of determining how much it is worth so that the Town may properly allocate the tax burden, as contemplated by our statutes and the

---

[8] The Fourth Amendment applies to the states through the Fourteenth Amendment. See, e.g., State v. Kramer, 2009 WI 14, ¶18 & n.6, 315 Wis. 2d 414, 759 N.W.2d 598 (citing Mapp v. Ohio, 367 U.S. 643 (1961)).

Wisconsin Constitution.  See Wis. Const. art. VIII, § 1; Wis. Stat. § 70.01.  The Town readily admits the Milewskis may not challenge their assessment if they do not grant the inspection request.  But it maintains that a tax assessor's "viewing" of the interior of the Milewskis' property is not a "search" within the meaning of the Fourth Amendment.  Even if such a viewing constitutes a search, the Town says, it is either self-evidently reasonable, or it is exempted from the Fourth Amendment's operation by the "compelling 'special' need to look inside people's homes" to satisfy the constitutional requirement that taxation of all properties in the Town be uniform.  In any event, the Town says, one of the alleged horns is missing, so there can be no dilemma.

¶18  The task before us is straightforward.  First, we must determine whether the Milewskis' situation affects the constitutionally-protected rights they asserted.  So we will examine whether there is a due-process right to contest a tax assessor's valuation of real property, and whether a tax assessor's nonconsensual, warrantless inspection of the interior of a home would be an unreasonable search.  Second, if this situation really does implicate two constitutionally-protected rights, we will inquire into whether the exercise of one can be conditioned on surrender of the other.  And finally, if this conditioning is impermissible, we must determine whether it results from an inexorable statutory command, or is instead the result of how the Town applied the statutes to the Milewskis.

10

A. Rights Claimed by the Milewskis

1. Due Process

¶19 The Milewskis were unable to challenge the revaluation of their Property before the Board of Review because the Town said Wis. Stat. § 70.47(7)(aa) rebuffs all those who do not first submit to a tax assessor's inspection of the interior of their homes. And they found the courthouse doors barred because Wis. Stat. § 74.37(4)(a) requires them to follow the procedural requirements of § 70.47, including the interior home inspection, before filing an excessive assessment claim. So their taxes have increased, but without any corresponding opportunity for administrative or judicial review of the added burden.

¶20 The Milewskis say the Town may not impose a tax that is not ultimately subject to judicial review without violating their due-process rights. A due-process challenge requires the complainant to establish two components. First, she must prove she has been deprived of a recognized right. Aicher, 237 Wis. 2d 99, ¶80. And second, she must prove that she has not been afforded process commensurate with the deprivation. Id. The focus of such claims is not on whether the State may infringe the right in question, but whether it has engaged the proper procedure in doing so. "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." Zinermon v. Burch, 494 U.S. 113, 125 (1990). This

11

constitutional guarantee protects an individual from the erroneous exercise of the State's authority. "Procedural due process rules are meant to protect persons . . . from the mistaken or unjustified deprivation of life, liberty, or property." Carey v. Piphus, 435 U.S. 247, 259 (1978). "Such rules 'minimize substantively unfair or mistaken deprivations of' life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests." Id. at 259-60.

¶21 The United States Constitution specifically extends the guarantee of due process to the deprivation of property: "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. Our Wisconsin constitution provides that "[a]ll people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed." Wis. Const. art. 1, § 1. Although the text of the U.S. and Wisconsin constitutional provisions differ, they "provide identical procedural due process protections." Cty. of Kenosha v. C & S Mgmt., Inc., 223 Wis. 2d 373, 393, 588 N.W.2d 236 (1999).

¶22 For constitutional purposes, a tax is a deprivation of property: "[E]xaction of a tax constitutes a deprivation of property . . . ." McKesson Corp. v. Div. of Alcoholic Beverages and Tobacco, Dept. of Business Regulation of Fla., 496

12

U.S. 18, 36 (1990). Consequently, a state imposing a tax "must provide procedural safeguards against unlawful exactions in order to satisfy the commands of the Due Process Clause." Id.

¶23 We know the nature of these safeguards well: "The elements of procedural due process are notice and an opportunity to be heard, or to defend or respond, in an orderly proceeding, adapted to the nature of the case in accord with established rules." State v. Thompson, 2012 WI 90, ¶46, 342 Wis. 2d 674, 818 N.W.2d 904 (quoting 16C C.J.S. Constitutional Law § 1444, at 188 (2005)); see also Penterman v. Wis. Elec. Power Co., 211 Wis. 2d 458, 474, 565 N.W.2d 521 (1997) (Due Process "entitles the individual to a fair opportunity to present his or her claim."). The review must be "adequate, effective, and meaningful." Bounds v. Smith, 430 U.S. 817, 822 (1977), overruled in part on other grounds by Lewis v. Casey, 518 U.S. 343 (1996). Whether the process is pre-deprivation or post, it must certainly occur:

> [W]e have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing before he is deprived of any significant property interest, . . . [but] it is well established that a State need not provide predeprivation process for the exaction of taxes.

McKesson Corp., 496 U.S. at 37 (internal citations and marks omitted).

¶24 The Milewskis have been subjected to a tax——a deprivation of property——but they have been forbidden any process by which to challenge it. So, absent an adequate explanation for how this came to pass, they have been denied

13

their Fourteenth Amendment due-process rights.[9]  The Town says there has been no violation because the Milewskis made the

_____

[9] The dissent says one must keep "two realities firmly in mind":

> ¶126 One. The Town's assessor did not enter the interior of the Milewskis' home. No search of the Milewskis' home occurred.
>
> * * *
>
> ¶128 Two, the Milewskis have received full due process hearings in three courts——in the circuit court, in the court of appeals, and in this court. Furthermore, the Milewskis retained and exercised rights under the statutes to a hearing in which they challenged the assessment on specified grounds.

Dissent, ¶¶125-26, 128.  The first of these "realities" is important only if the second is true.  It is not.

The Board of Review, relying on Wis. Stat. § 70.47(7)(aa), denied the Milewskis' request to appear and present their challenge to the reassessment because they had refused the home inspection.  The circuit court did not address the assessment because it concluded there was no constitutional violation in requiring the Milewskis to allow a home inspection as a precondition to its challenge.  The court of appeals reviewed and affirmed this determination.  And we are addressing the constitutionality of the statutory scheme, not the assessment of the Milewskis' home.  So at no time have the Milewskis been able to present their excessive assessment claim to any tribunal.

Not even the Town attempted the dissent's contra-factual argument.  Instead, it candidly acknowledged that the Milewskis lost the right to challenge their assessment by refusing the home inspection, stating, for example, that "the result of this refusal is that they [the Milewskis] would be unable to challenge the assessment."  The dissent's position is not supported by the facts or the Town itself.

(continued)

14

affirmative decision to deny the tax assessor an interior inspection of their home. Foreclosing an administrative or judicial review of the revaluation, they say, is the "legal, logical, and natural result" of that decision, for to do otherwise would be "inconsistent with well-established law on the property owner's burden of proof because the homeowner has the affirmative burden of proving that the fair market value is different than the assessor's determination being challenged." Thus, "[w]ithout putting the interior of their home——which comprises about 70% of its value——into evidence," the Town concludes, "the homeowners logically, and equitably, cannot meet their burden of proving the fair market value is different from what the assessor determines."

¶25 This argument conflates two important, but distinct, principles. The right to a hearing is not the same thing as the burden of proof one must satisfy by the end of that hearing. Nor do the concepts protect the same interests. The former ensures access to a neutral magistrate to resolve disputes and is constitutionally guaranteed. The latter is a prudential recognition that he who seeks to change the status quo must

---

So the most that can be said of the dissent's argument is that the Milewskis have been able to litigate whether they should be allowed to litigate the new tax assessment. That, of course, is not the same thing as actually challenging the tax assessment, as even the Town admits.

overcome its inertia, and is subject to adjustment based on policy considerations.[10]

¶26 We agree with the Town that the Milewskis must be prepared to offer evidence sufficient to overcome the assessor's conclusion if they hope to change the Property's valuation. A challenger must "in good faith present[] evidence to such board [of review] in support of such objections and [make] full disclosure before said board, under oath of all of that person's property liable to assessment in such district and the value thereof." Wis. Stat. § 70.47(7)(a). This obligation is significant because the assessor's valuation is presumptively correct. Wis. Stat. § 70.47(8)(i) ("The board shall presume that the assessor's valuation is correct. That presumption may be rebutted by a sufficient showing by the objector that the valuation is incorrect."); Wis. Stat. § 70.49(2) ("The value of all real and personal property entered into the assessment

---

[10] As we noted in State v. Big John:

> The question of which party has the burden of proof on this issue is determined by the application of the five-factor analysis outlined in McCormick, Handbook of the Law of Evidence, § 337 at 787-89 (2d ed. 1972), and adopted by this court in State v. McFarren, 62 Wis.2d 492, 499-503, 215 N.W.2d 459 (1974). The five factors to be considered are: (1) the natural tendency to place the burden on the party desiring change; (2) special policy considerations such as those disfavoring certain defenses; (3) convenience; (4) fairness; and (5) the judicial estimate of probabilities.

State v. Big John, 146 Wis. 2d 741, 755, 432 N.W.2d 576 (1988).

roll . . . in all actions and proceedings involving such values, [is] presumptive evidence that all such properties have been justly and equitably assessed in proper relationship to each other."). We express no opinion on whether the Milewskis will be able to carry their burden of proof upon the contest of the Property's value, but that has nothing to do with whether they have the right to hazard the attempt. The Milewskis may not be denied due process with respect to the revaluation of their Property.[11]

### 2. Freedom From Unreasonable Searches

¶27 We next determine whether a tax assessor's warrantless inspection of the interior of a home would be an unreasonable search. On this subject, the Fourth Amendment to the United States Constitution says:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

---

[11] The dissent is concerned we are restoring the Milewskis' due-process rights without penalizing them for exercising their Fourth Amendment rights. Dissent, ¶183 ("According to the lead opinion, a property owner can, without any adverse consequences, refuse an assessor an actual view of the real property and apparently can still contest the amount of the assessment.") First, the suggestion that someone should be penalized for exercising his constitutionally-protected rights is more than a little chilling. And second, we have not said the Milewskis will not suffer adverse consequences from refusing the home inspection. As this paragraph recognizes, their choice may have created substantial impediments to successfully challenging the Town's reassessment. However, the consequences are not a penalty for exercising their rights, but are instead the potential result of applying required evidentiary standards to their claim.

17

searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Its Wisconsin counterpart, found in Article I, section 11 of the Wisconsin Constitution,[12] is substantively identical, and we normally interpret it coextensively with the United States Supreme Court's interpretation of the Fourth Amendment.[13] See, e.g., State v. Dumstrey, 2016 WI 3, ¶14, 366 Wis. 2d 64, 873 N.W.2d 502 (citing State v. Arias, 2008 WI 84, ¶20, 311 Wis. 2d 358, 752 N.W.2d 748).

¶28 The constitutionality of a tax assessor's inspection of the interior of a home turns on three questions. First, whether the inspection is a search at all within the meaning of the Fourth Amendment. Second, whether the inspection (if it is a search) fits within a recognized exception to the Fourth Amendment's operation. And third, if no recognized exception covers the inspection, whether it is nonetheless reasonable.

---

[12] "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." Wis. Const. art. I, § 11.

[13] Our references to the Fourth Amendment throughout this opinion also encompass Article 1, sec. 11 of the Wisconsin Constitution unless otherwise noted.

### a. Is an "Interior View" a "Search"?

¶29 Whether a tax assessor's "viewing" has constitutional significance depends on what the term "search" meant at the time of the Fourth Amendment's adoption. *Kyllo v. United States,* 533 U.S. 27, 34 (2001) (The court must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."). To obtain a baseline understanding of what manner of intrusion comprises a "search," the United States Supreme Court recently had reference to the English case of Entick v. Carrington.[14] See United States v. Jones, 565 U.S. 400, 404-05 (2012). The Court had previously described this case (Entick) as a "'monument of English freedom'" that was "undoubtedly familiar to every American statesman at the time the Constitution was adopted, and considered to be the true and ultimate expression of constitutional law . . . ." Brower v. Cty. of Inyo, 489 U.S. 593, 596 (1989) (internal marks omitted) (quoting Boyd v. United States, 116 U.S. 616, 626 (1886) (overruled on other grounds).

¶30 In Entick, the Jones Court found a close connection between "searches" and the law of trespass. Jones, 565 U.S. at 405. There, Lord Camden admonished that "'[o]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave; if he does he is a

---

[14] 95 Eng. Rep. 807 (C.P. 1765).

19

trespasser, though he does no damage at all; if he will tread upon his neighbour's ground, he must justify it by law.'" Jones, 565 U.S. at 405 (quoting Entick, 95 Eng. Rep. at 817).[15] With that principle in mind, the Jones Court had no difficulty concluding a search occurred when government agents attached a tracking device to an individual's automobile. Id. at 404-05. When "[t]he Government physically occupie[s] private property for the purpose of obtaining information[,]" the Court said, there is "no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted." Id. at 404; State v. Sobczak, 2013 WI 52, ¶12, 347 Wis. 2d 724, 833 N.W.2d 59 (same).[16]

¶31 When the government proposes to enter a home to obtain information relevant to levying a tax, we have even more precise historical guidance at hand. "In order to ascertain the nature of the proceedings intended by the fourth amendment to the constitution under the terms 'unreasonable searches and seizures,' it is only necessary to recall the contemporary or

---

[15] Trespass, of course, is not the only government intrusion that can cause a Fourth Amendment violation. United States v. Jones, 565 U.S. 400, 411 ("we do not make trespass the exclusive test" for identifying a Fourth Amendment violation).

[16] "It has long been established that the Fourth Amendment places the greatest protection around the home, as it was drafted in part to codify 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.'" State v. Sobczak, 2013 WI 52, ¶11, 347 Wis. 2d 724, 833 N.W.2d 59 (quoting Payton v. New York, 445 U.S. 573, 601 (1980)).

then recent history of the controversies on the subject, both in this country and in England." Boyd, 116 U.S. at 624-25. One of those controversies, which still informs our view of the Fourth Amendment, was the practice of granting revenue agents general warrants to search homes for taxable items:

> "Vivid in the memory of the newly independent Americans were those general warrants known as writs of assistance under which officers of the Crown had so bedeviled the colonists. The hated writs of assistance had given customs officials blanket authority to search where they pleased for goods imported in violation of British tax laws. They were denounced by James Otis as 'the worst instrument of arbitrary power, the most destructive of English liberty, and the fundamental principles of law, that ever was found in an English law book,' because they placed 'the liberty of every man in the hands of every petty officer.' The historic occasion of that denunciation, in 1761 at Boston, has been characterized as 'perhaps the most prominent event which inaugurated the resistance of the colonies to the oppressions of the mother country.'"

Payton v. New York, 445 U.S. 573, 583 n.21 (1980) (quoting Stanford v. Texas, 379 U.S. 476, 481–82 (1965) (quoting *Boyd*, 116 U.S. at 616, 625)).

¶32 This history tells us that, at the time the Fourth Amendment was adopted, a "search" occurred when a government agent trespassed on private property in pursuit of revenue-raising information. Our statutes preserve the home's sanctity against revenue agents by making it clear that tax assessors trespass if they enter a home without consent. See Wis. Stat. § 943.13(4m)(am)4. (no trespass exemption for tax assessors entering residences or buildings within curtilage); see also

21

Wis. Stat. § 70.05(4m) ("A property owner may deny entry to an assessor if the owner has given prior notice to the assessor that the assessor may not enter the property without the property owner's permission."). So, as Entick observed, and Jones confirmed, if a tax assessor "'will tread upon his neighbour's ground, he must justify it by law.'" Jones, 565 U.S. at 405 (quoting Entick, 95 Eng. Rep. at 817).

¶33 This is not, however, how the Town views its proposed inspection of the Milewskis' home. It sees the Fourth Amendment primarily through a procedural lens in which the purpose for the government agent's presence in the home is less significant than the manner by which he came to be there. It says no search takes place under these circumstances because the assessor sends a letter that provides "advance notice to homeowners when requesting to view their home for an assessment," which "explains the purpose behind the assessment, the right to refuse the request and the consequences of that refusal." "[T]he advance notice[] gives the homeowner ample opportunity to question the legitimacy, nature, and scope of the assessment." The interior view does not "involve a 'true search for violations,'" and there are no "criminal consequences for denying entry." Instead, refusal "result[s] only in possible financial consequences that the homeowner is informed of before choosing" whether to allow the tax assessor entry to her home. These procedures, and their attendant limitations on a government agent's discretion, inform the Town's conclusion that

22

no search occurs when an assessor enters a home in search of something to tax.

¶34 The Town's argument, however, gets a little ahead of itself. The question at this stage of the analysis is whether the tax assessor would be performing a search within the meaning of the Fourth Amendment by viewing the interior of the Milewskis' home. Whether he gives advance notice of when the viewing will occur, or provides assurance that refusing him an audience will cause merely financial penalties, may or may not have something to say about the reasonableness of a search, but it says nothing about whether his "viewing" belongs in the Fourth Amendment "search" category. The Jones Court cast that query in strictly functional terms, declaring that a search occurs when "[t]he Government physically occupie[s] private property for the purpose of obtaining information." 565 U.S. at 404. The formalities surrounding the viewing do not define what the viewing actually is.

¶35 The Town offered Wyman v. James as an example of how a government agent may enter a home without triggering a search within the meaning of the Fourth Amendment. 400 U.S. 309 (1971). The eponymous Mrs. James applied for, and received, financial benefits under the federal Aid to Families with Dependent Children program ("AFDC"). Id. at 313-14. The State of New York, in administering the AFDC program for state residents, required periodic home visits by a caseworker to ensure the beneficiaries were putting program funds to the intended uses. See id. at 313-16. Mrs. James filed a civil

23

rights action alleging the home visits were searches that violated the Fourth Amendment. Id. at 314-15.

¶36 The Supreme Court did not agree. It acknowledged that the visits had both "rehabilitative and investigative" aspects, but brushed off the latter because it "is given too broad a character and far more emphasis than it deserves if it is equated with a search in the traditional criminal law context." Id. at 317. Concentrating instead on the consensual nature of home visits, and the fact that withholding consent merely stopped the flow of AFDC benefits, the Court found no search within the meaning of the Fourth Amendment:

> We note, too, that the visitation in itself is not forced or compelled, and that the beneficiary's denial of permission is not a criminal act. If consent to the visitation is withheld, no visitation takes place. The aid then never begins or merely ceases, as the case may be. There is no entry of the home and there is no search.

Id. at 317-18. Underlining the importance of consent to its analysis, the Court signaled that the home visits could become searches should they lose their consensual nature:

> If however, we were to assume that a caseworker's home visit, before or subsequent to the beneficiary's initial qualification for benefits, somehow (perhaps because the average beneficiary might feel she is in no position to refuse consent to the visit), and despite its interview nature, does possess some of the characteristics of a search in the traditional sense, we nevertheless conclude that the visit does not fall within the Fourth Amendment's proscription. This is because it does not descend to the level of unreasonableness. It is unreasonableness which is the Fourth Amendment's standard.

Id. at 318.

24

¶37 Wyman provides no assistance in determining whether the tax assessor's proposed view of the interior of the Milewskis' home is a Fourth Amendment search. It does not actually define what manner of activity qualifies as a search for Fourth Amendment purposes. Instead, it asks whether the homeowner has excused the government agent from complying with constitutional requirements at all. The Fourth Amendment, of course, does not prohibit consensual searches. See, e.g., Florida v. Bostick, 501 U.S. 429, 439 (1991) ("The Fourth Amendment proscribes unreasonable searches and seizures; it does not proscribe voluntary cooperation"); see also, United States v. Williams, 521 F.3d 902, 905 (8th Cir. 2008) ("Consensual searches do not violate the Fourth Amendment . . . ."). The Fourth Amendment is no barrier to consensual searches not because the activity is not a search, but because consent removes the search from Fourth Amendment scrutiny. So it is only in the absence of consent that we need to determine whether a certain activity has constitutional significance. Because Wyman relied on consent as the decisional principle, it did not explicitly decide whether the caseworker's activity in Mrs. James' home constituted a search.

¶38 The Town argues that if the Milewskis and Mrs. James' situations are not sufficiently comparable, we should analogize this case to an analogy employed by the Wyman Court:

> It seems to us that the situation is akin to that where an Internal Revenue Service agent, in making a routine civil audit of a taxpayer's income tax return, asks that the taxpayer produce for the agent's review

25

some proof of a deduction the taxpayer has asserted to his benefit in the computation of his tax. If the taxpayer refuses, there is, absent fraud, only a disallowance of the claimed deduction and a consequent additional tax. The taxpayer is fully within his "rights" in refusing to produce the proof, but in maintaining and asserting those rights a tax detriment results and it is a detriment of the taxpayer's own making. So here Mrs. James has the "right" to refuse the home visit, but a consequence in the form of cessation of aid, similar to the taxpayer's resultant additional tax, flows from that refusal. The choice is entirely hers, and nothing of constitutional magnitude is involved.

400 U.S. at 324.

¶39 This analysis offers no guidance and, indeed, illustrates the limited utility of recursive analogies. An analogy is helpful when it illuminates a central proposition by considering it in a different, but logically related, context. Building one analogy on another risks shifting the focus from the central proposition to something peripheral, as occurred here. The Wyman Court employed the IRS analogy in determining whether the caseworker's home visit was constitutionally reasonable. That is, it was not using the analogy to determine whether the home visit was a search——it was assuming, as part of its premises, that the visit was a search within the Fourth Amendment's comprehension. So when the Town asserts a "viewing" is not a search because, like "the hypothetical plaintiff in the [Wyman] Court's example, Milewski and MacDonald face no criminal penalties for refusing entry into their home[;] [t]he only consequence is a tax detriment of their own making," it builds its foundation on the IRS analogy's premise that the visit was a search. Thus, the recursive analogies resulted in a petitio

26

principii error (positing an argument's conclusion in the premises). Wyman's analogy, therefore, has nothing instructive to say about whether an "interior viewing" is a search within the meaning of the Fourth Amendment.

¶40 In determining whether a tax assessor conducts a constitutionally-significant search when viewing the interior of a home, we apply the elegantly simple Jones formulation: If a government agent occupies private property for the purpose of obtaining information, he is conducting a search within the meaning of the Fourth Amendment. The Town's own argument confirms this would be a search. It is the Town's central point that a tax assessor must physically enter the Milewskis' home to conduct an interior view. And by describing the viewing as "a simple requirement that taxpayers disclose the information relevant to the value of their home," the Town admitted the purpose of the assessor's presence would be to obtain revenue-related information. Thus, a tax assessor who enters a home to conduct an "interior view" occupies private property for the purpose of obtaining information and is therefore conducting a search within the meaning of the Fourth Amendment.

b. Exception to the Fourth Amendment

¶41 The Town asserts that a tax assessor's search of a home fits within the "special needs" exception to the Fourth Amendment's protection. It refers us to City of Indianapolis v. Edmond for instruction. 531 U.S. 32 (2000). There we find that the United States Supreme Court has recognized a mélange of

27

circumstances in which searches are constitutionally reasonable even in the absence of individualized suspicion of wrongdoing:

> [W]e have upheld certain regimes of suspicionless searches where the program was designed to serve "special needs, beyond the normal need for law enforcement." See, e.g., Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646 (1995) (random drug testing of student-athletes); Treasury Emps. v. Von Raab, 489 U.S. 656 (1989) (drug tests for United States Customs Service employees seeking transfer or promotion to certain positions); Skinner v. Ry. Labor Execs. Assn., 489 U.S. 602 (1989) (drug and alcohol tests for railway employees involved in train accidents or found to be in violation of particular safety regulations). We have also allowed searches for certain administrative purposes without particularized suspicion of misconduct, provided that those searches are appropriately limited. See, e.g., New York v. Burger, 482 U.S. 691, 702-704 (1987) (warrantless administrative inspection of premises of "closely regulated" business); Michigan v. Tyler, 436 U.S. 499, 507-509, 511-512 (1978) (administrative inspection of fire-damaged premises to determine cause of blaze); Camara v. Mun. Court of City and Cty. of San Francisco, 387 U.S. 523, 534-539 (1967) (administrative inspection to ensure compliance with city housing code).

Edmond, 531 U.S. at 37. The Town asks us to add tax assessment searches to this potpourri because revenue collection is a "special need," and the search is "not aimed at all at criminal——or even civil code——enforcement."

¶42 Whatever the merits of those exceptions, the Town has not directed our attention to any case suggesting that assessing or collecting taxes is a need so special that it excuses compliance with the Fourth Amendment. Nor have we found any. To the contrary, G.M. Leasing Corp. v. United States, 429 U.S. 338 (1977), teaches that the Fourth Amendment admits of no

28

"tax revenue" special exception. In that case, the Court considered whether United States revenue agents could enter a corporation's business offices without a warrant to seize various books and records useful to their tax collection efforts. See id. at 352-53. The United States made an argument similar to what the Town offers us: "The respondents argue that there is a broad exception to the Fourth Amendment that allows warrantless intrusions into privacy in the furtherance of enforcement of the tax laws." Id. at 354. It also maintained that "the history of the common law in England and the laws in several States prior to the adoption of the Bill of Rights support the view that the Fourth Amendment was not intended to cover intrusions into privacy in the enforcement of the tax laws." Id. at 355.

¶43 After noting the government's unquestionable authority to "lay and collect Taxes," the Court nonetheless recognized that "one of the primary evils intended to be eliminated by the Fourth Amendment was the massive intrusion on privacy undertaken in the collection of taxes pursuant to general warrants and writs of assistance." Id. The Court found no evidence supporting the United States' assertion that the Fourth Amendment was historically understood as not reaching matters of revenue. Id. ("We do not find in the cited materials anything approaching the clear evidence that would be required to create so great an exception to the Fourth Amendment's protections against warrantless intrusions into privacy."). So the Court affirmed the Fourth Amendment's application to searches in aid

29

of tax revenues: "The intrusion into petitioner's office is therefore governed by the normal Fourth Amendment rule that 'except in certain carefully defined classes of cases, a search of private property without proper consent is "unreasonable" unless it has been authorized by a valid search warrant.'" G.M. Leasing Corp., 429 U.S. at 358 (quoting Camara, 387 U.S. at 528-29). The Supreme Court's reasoning neatly answers the Town's argument, and so we decline the invitation to declare that administering the property tax statutes is a "special need" that exempts tax assessment searches from the Fourth Amendment's proscriptions.[17]

c. Is an "Interior View" a Reasonable Search?

¶44 Because the Fourth Amendment forbids only "unreasonable" searches, we must determine whether—notwithstanding the inapplicability of any recognized exception to the Fourth Amendment——it is nonetheless reasonable to require homeowners to submit to a tax assessor's periodic inspection of the interior of their homes. The basic framework of our inquiry is as follows:

> Under our general Fourth Amendment approach we examine the totality of the circumstances to determine whether a search is reasonable within the meaning of the Fourth Amendment. Whether a search is reasonable is

---

[17] The dissent justifies nonconsensual, warrantless home inspections as an aid in administration of our property tax laws. But the United States Supreme Court has already rejected that rationale. See G.M. Leasing Corp. v. United States, 429 U.S. 338 (1977). The dissent does not explain how this justification can co-exist with G.M. Leasing Corp.

30

determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.

Samson v. California, 547 U.S. 843, 848 (2006) (internal marks and citations omitted). Because we are addressing the propriety of a potential warrantless home search, we presume it would be unreasonable and therefore unconstitutional. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton, 445 U.S. at 586; see also Camara, 387 U.S. at 528-29 ("[O]ne governing principle, justified by history and by current experience, has consistently been followed: except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant.") (citing Stoner v. California, 376 U.S. 483 (1964); United States v. Jeffers, 342 U.S. 48 (1951) overruled on other grounds by Rakas v. Illinois, 439 U.S. 128 (1978); McDonald v. United States, 335 U.S. 451 (1948); Agnello v. United States, 269 U.S. 20 (1925)). It is the Town's burden to demonstrate a nonconsensual, warrantless search of the Milewskis' home is reasonable even though it does not fit within a recognized exception to the Fourth Amendment.

¶45 The Town does not say there is anything peculiar about the Milewskis' home that requires an interior inspection. In fact, its thesis is quite the contrary——it says that every home in the Town of Dover must be open to a tax assessor's inspection without any particularized demonstration of need. Therefore, we

31

understand the Town to be asking us to adopt a bright-line rule that warrantless home searches, conducted by tax assessors in conformance with the requirements of Wis. Stat. ch. 70, are reasonable as a matter of law.

¶46 The Town says such searches are reasonable for three reasons.  First, they are useful in ensuring compliance with our constitution's "Uniformity Clause."  Second, the intrusion is relatively minor.  And third, a warrant would be a mere formality, which demonstrates such searches are always reasonable.

### i.   The Uniformity Clause

¶47 The process by which Wisconsin municipalities raise revenues makes a proper valuation of real property not just important, but essential to fulfillment of the constitutional command that "[t]he rule of taxation shall be uniform . . . ." See Wis. Const. art. VIII, § 1.  The process begins with the municipality calculating how much revenue it needs from property taxes.  See Jack Stark, The Uniformity Clause of the Wisconsin Constitution, 76 Marq. L. Rev. 577 (1993).  It then determines the total value of taxable property in the jurisdiction.  Id. at 577-78.  Finally, it sets the mill rate[18] at a level that will

_____

[18] Investopedia defines mill rate as follows:  "The mill rate, also referred to as the millage rate, is a figure representing the amount per $1,000 of the assessed value of property, which is used to calculate the amount of property tax. The term 'millage' is derived from a Latin word meaning 'thousandth,' with 1 mill being equal to 1/1,000th of a currency unit."        See    Mill      Rate,       Investopedia, http://www.investopedia.com/terms/m/millrate.asp  (last  visited June 28, 2017).

generate the required revenue. <u>Id.</u> at 578. A property owner calculates his tax liability by multiplying the mill rate by the assessed value of his property. <u>Id.</u> Raising or lowering the assessed value of a particular property, therefore, does not change the amount of revenue the municipality raises. It simply changes the allocation of the tax burden amongst the municipality's property owners. The purpose of the Uniformity Clause is to ensure the tax burden is allocated proportionally to the value of each person's property. <u>Gottlieb v. City of Milwaukee</u>, 33 Wis. 2d 408, 426, 147 N.W.2d 633 (1967) (The purpose of the uniformity clause is "to protect the citizen against unequal, and consequently unjust taxation." (quoting <u>Weeks v. City of Milwaukee</u>, 10 Wis. 186, 201 (1860)).

¶48 Satisfying the Uniformity Clause requires not just a uniform tax rate, but a uniform method of determining the value of the property to which that rate will apply.

> The act of laying a tax on property consists of several distinct steps, such as the assessment or fixing of its value, the establishing of the rate, etc.; and in order to have the rule or course of proceeding uniform, each step taken must be uniform. The valuation must be uniform, the rate must be uniform. Thus uniformity in such a proceeding becomes equality; and there can be no uniform rule which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality or local subdivision of the government, within and for which the tax is to be raised.

<u>Knowlton v. Bd. of Supervisors of Rock Cty.</u>, 9 Wis. 410, 420-21 (1859). Our statutes prescribe that uniform methodology: "Real property shall be valued by the assessor in the manner specified

33

in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale." Wis. Stat. § 70.32(1).

¶49 The Town asserts its home searches are necessary to carry out the Uniformity Clause mandate. It notes that the Wisconsin Property Assessment Manual[19] says "the assessor must make a thorough, detailed, and objective viewing of each property, noting relevant characteristics as they relate to physical condition, effective age, and functional utility." Wis. Dep't of Revenue, Wisconsin Property Assessment Manual, 12-20 (2017) (hereinafter "WPAM"). With respect to real property, Gardiner says the Manual insists on an interior view of all buildings: "In the case of real property, actual view requires

---

[19] The Wisconsin Property Assessment Manual is published by the Wisconsin Department of Revenue as required by statute. The manual must accomplish the following:

> The manual shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level. The manual shall be amended by the department from time to time to reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information considered valuable to local assessors by the department.

Wis. Stat. § 73.03(2a).

34

a detailed viewing of the interior and exterior of all buildings and improvements and the recording of complete cost, age, use, and accounting treatments." Id. at 10-55. Gardiner also refers to a number of appraisal guidelines emphasizing the importance of interior inspections.

¶50 The Town and Gardiner are likely right that an interior view of the Milewskis' home would be the most direct method of obtaining the information necessary to perform a revaluation. But this is only one of the statutorily-prescribed methods of developing a valuation: "Real property shall be valued . . . from actual view or from the best information that the assessor can practicably obtain . . . ." Wis. Stat. § 70.32(1) (emphasis added). The statute gives the assessor two potential sources of information with which to develop a valuation. It lists those sources in the disjunctive, and suggests no preference for one over the other.[20] The Manual acknowledges and reflects these options. WPAM at 10-55 ("The statutes require that real . . . property be valued from actual view or the best information obtainable." (Emphasis added.)).

---

[20] "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659).

So the plain meaning of the statute is that an assessor may develop a valuation out of either source of information.[21]

¶51 The Town's actions, as well as other statutes, tell us that the Uniformity Clause does not require an interior inspection of the Milewskis' home. A homeowner has a statutory right to deny a tax assessor entry, and an assessor who enters anyway is a trespasser. See Wis. Stat. § 70.05(4m), Wis. Stat. § 943.13(4m)(am)4. Yet, securing one's property against the tax assessor does not grind the valuation mechanism to a halt, as the Town itself demonstrated. The Town proved itself capable of valuing the Milewskis' home notwithstanding its inability to perform an interior inspection. It may be that the valuation is incorrect, as the Milewskis claim, but the Town presumably sought the "best information that the assessor [could] practicably obtain", as allowed by Wis. Stat. § 70.32(1), and developed the valuation accordingly. If proceeding under this alternative was not consistent with the Uniformity Clause, then the Town indicts itself for violating the constitution by assigning a value to the Milewskis' home without an interior

---

[21] The dissent says these really are not disjunctive options, and spends most of its analytical space trying to empty all meaning out of the second option into the first. But if the second option really means nothing more than the first, then the legislature acted frivolously when it added that option to the statute. See I Sandborn & Berryman Ann. Stats. (1889) § 1052. We try not to treat legislative enactments as surplusage. State ex rel. Kalal v. Circuit Court for Dane Cty., 271 Wis. 2d 633, ¶46 ("Statutory language is read where possible to give reasonable effect to every word, in order to avoid surplusage.").

36

inspection. And if the Town based its valuation on something other than an "actual view" or the "best information" practicably available, it has not said what it was or where it obtained the authority to do so. Thus, the Town cannot argue, without contradicting itself, that the Uniformity Clause requires an interior inspection while simultaneously taxing the Milewskis based on a valuation it developed without such an inspection.

¶52 Finally, if the Uniformity Clause does not allow valuations based on the "best information" option (the option the Town appears to have exercised), then the constitutionality of Wis. Stat. § 70.32(1) becomes suspect. But no one has made such an argument, and because we presume our statutes are constitutional, we will not indulge any such speculation. See, e.g., In re Gwenevere T., 333 Wis. 2d 273, ¶46 ("Statutes are generally presumed constitutional" and we will not find otherwise unless "there is proof beyond a reasonable doubt that the statute is unconstitutional."). Thus, we conclude that although an interior inspection may be useful, convenient, and expedient in developing a valuation, the Uniformity Clause does not require it.

### ii. Minor Intrusion

¶53 The home does not stand on the same footing as other spaces protected by the Fourth Amendment: "[W]hen it comes to the Fourth Amendment, the home is first among equals." Florida v. Jardines, 569 U.S. ___, 133 S. Ct. 1409, 1414 (2013). We do

not equivocate on this principle. "There can be no doubt that 'the Fourth Amendment has drawn a firm line at the entrance to the house'" and that "it is our duty to zealously guard that line." Sobczak, 347 Wis. 2d 724, ¶27 (quoting Payton, 445 U.S. at 590).

¶54 So when the Town says a tax assessor's uninvited visit is a "relatively minor" intrusion in one's home, we look closely at what he proposes to do there. Gardiner said it would conduct a "detailed viewing of the interior . . . of all buildings and improvements and the recording of complete cost, age, use, and accounting treatments." It says "[i]t is essential that the assessor perform a thorough, detailed, and objective viewing of each property" that is "field verified and accurate." Part of what Gardiner would be seeking is evidence of the home's "effective age," which requires it to carefully consider "abuse, neglect, general maintenance, and all other influences on the physical condition of the improvements." This search requires the assessor to "inspect the interior of a minimum of 90%" of the home. In the process of the search, the assessor scrutinizes such personal spaces as bedrooms, kitchens, basements, and bathrooms. If this was a medical examination, "minor intrusion" is not the description that would come to mind.

¶55 The Town and Gardiner also say such searches are relatively minor intrusions because they are preceded by notice, and the homeowner has an opportunity to schedule the search. It says this procedure even "gives homeowners time to tuck away any

38

personal property they do not want the assessor to see." While this procedural politeness is certainly welcome, it does nothing to detract from the offense given by the search itself. As Boyd recognized, the Fourth Amendment's principles "apply to all invasions on the part of the government and its employees of the sanctity of a man's home and the privacies of life." 116 U.S. at 630. The Fourth Amendment is less concerned with the politeness with which the government agent enters a home than it is with the fact he is there at all. "It is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security, personal liberty, and private property . . . ." Id.

¶56 The Town further asserts the intrusion is minor because it "is clearly less than in searches where the government is checking the homeowner's compliance with civil or criminal rules and the homeowner faces the specter of being found guilty of violations and having to pay fines or criminal consequences." That may be true, but it misapprehends the significance of this constitutionally-protected right. The purpose of the Fourth Amendment is not to provide an opportunity to secret away the fruits and instrumentalities of crime (although it can sometimes have that incidental effect). The point is to protect a person's right to be secure in one's home, to lie in repose, or partake of what activities one wishes, free of the government's watchful eye. The Fourth Amendment's promise is that a person may stand in his door and tell the

39

government agent "you shall not pass":  "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ."  United States v. U.S. Dist. Court for E. Dist. of Mich., So. Div., 407 U.S. 297, 313 (1972).

¶57 The intrusiveness of a search lies on a continuum; a pat-down incident to a Terry stop[22] might lie near one end, while towards the other end lies a search of one's home so microscopically punctilious that it can pry even into the owner's most private of thoughts.[23]  Somewhere along that continuum the government hits the zealously guarded "firm line

---

[22] Terry v. Ohio, 392 U.S. 1 (1968).

[23] See State ex rel. Two Unnamed Pet'rs v. Peterson, 2015 WI 85, ¶18, 363 Wis. 2d 1, 866 N.W.2d 165 (the sought-after information included emails on computers seized during the search).

at the entrance of the house." Beyond that line there are no minor intrusions.[24]

### iii. Warrant

¶58 The Town asserts we may deduce the reasonableness of a tax assessor's search by considering what an application for an administrative search warrant might say. Because the assessor has the duty to inspect the interior of everyone's home, the Town argues, every application for an administrative warrant would be the same, and would simply repeat the contents of the notice already sent to the homeowner. With no requirement to find a particularized need for the search, the argument goes, the warrant application process would be a kabuki play ending with the magistrate's predestined approval. If every application necessarily results in issuance of a warrant, then such searches are categorically reasonable.

---

[24] One of the concurrences says this statement is too broad. Justice Ziegler's concurrence, ¶103. This should be an entirely unremarkable statement, and it is troubling that, apparently, it is not. If we cannot rouse ourselves enough to say this, then maybe Justice Ann Walsh Bradley is right when she said, just this term, that our jurisprudence "continues the erosion of the Fourth Amendment." State v. Floyd, 2017 WI ___, ¶48, ___ Wis. 2d___, ___ N.W.2d ___ (Ann Walsh Bradley, J., dissenting). And if that is the case, then we should stop making grand-sounding statements like "There can be no doubt that 'the Fourth Amendment has drawn a firm line at the entrance to the house'" and that "it is our duty to zealously guard that line." Sobczak, 347 Wis. 2d 724, ¶27 (quoting Payton, 445 U.S. at 590). We should say what we mean, and if what we mean is that finding an uninvited government agent trespassing in one's home can be a "minor" intrusion, then it would be far more accurate to say that we lackadaisically observe a permeable line somewhere in or around the house.

¶59 We find a parallel to the Town's argument in Camara. There, the Court considered whether a municipal health inspector must obtain a warrant to annually conduct routine interior inspections for evidence of building code violations. It was asserted that the "decision to inspect an entire municipal area is based upon legislative or administrative assessment of broad factors such as the area's age and condition." Id. 387 U.S. at 532. Thus, "[u]nless the magistrate is to review such policy matters, he must issue a 'rubber stamp' warrant which provides no protection at all to the property owner." Id.

¶60 The Camara Court disagreed. It noted that in a warrantless inspection regime "the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization." Id. This leaves the building's occupant at the mercy of "the discretion of the official in the field." Id. The warrant requirement exists for the specific purpose of limiting such discretion: "This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disinterested party warrant the need to search." Id. at 532-33. It concluded that a statutorily-prescribed search regime was no substitute for a neutral magistrate's review before intruding in someone's home. "We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory

42

safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty." Id. at 533.

¶61 A warrant requirement here would be even more justified than in Camara. There, the health inspector had an indisputable statutory obligation to conduct interior searches. The same is not true here. As we discussed above, the tax assessor may base his valuation on either an actual view of the home or, instead, the "best information" practicably available to him. If he believes the "best information" available still leaves him with insufficient data on which to build a constitutionally-sound valuation for a specific home, he may explain why that is so in his application for an administrative warrant. As in Camara, the warrant will also perform the salutary function of advising the homeowner of the lawful basis for the inspection of his home, describing the search's proper limits, and identifying the assessor as one with authority to search. A warrant requirement in these circumstances would be no meaningless paper-shuffle.[25]

\* \* \*

¶62 A tax assessor's inspection of a home's interior is a search within the meaning of the Fourth Amendment, and so it is

---

[25] Notwithstanding the striking similarities between the legislative schemes at issue both here and in Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523 (1967), the dissent does not explain why San Francisco needed a warrant, but the Town of Dover does not.

presumptively unreasonable——and therefore unconstitutional——in the absence of a warrant. The Town has offered nothing that overcomes that presumption, and so we find that a tax assessor's warrantless search of a home would be unconstitutional without consent.

## B. The Dilemma

¶63 So the Milewskis really did, and do, face a dilemma. They have a right to challenge the revaluation of their Property, as well as a right to prevent the tax assessor from inspecting the interior of their home without consent. The question now is whether the Town may require them to surrender one as the price for exercising the other. We all learned how to address this type of situation when we were children: Two wrongs don't make a right. It would have been a constitutional wrong to perform a warrantless search of the Milewskis' home in search of taxable value, and it was in fact a constitutional wrong to deprive them of their due process rights. Forcing a person to choose between constitutional injuries does not make the one he chooses any less injurious.

¶64 The purpose of giving a right constitutional stature is to protect it from legislative or executive suspension. If, instead of setting two rights at odds, a statute flatly banned judicial review of a tax assessor's revaluation of real property, a brief recitation of our due-process catechism would summarily consign it to the realm of unconstitutional acts. Likewise, a legislative act authorizing an unreasonable search of a person's home would experience a similarly swift demise.

Because we can so easily dispatch such obvious assaults, it would be odd if what cannot be done directly could yet be accomplished indirectly through the expedient of juxtaposing one constitutional right against another.

> It would be a palpable incongruity to strike down an act of state legislation which, by words of express divestment, seeks to strip the citizen of rights guaranteed by the federal Constitution, but to uphold an act by which the same result is accomplished under the guise of a surrender of a right in exchange for a valuable privilege which the state threatens otherwise to withhold.

Frost v. R.R. Comm'n of Cal., 271 U.S. 583, 593 (1926).[26]

¶65 The attempt to negate one constitutional right by pitting it against another is a gambit not unknown to the law. One of the earlier cases to address this situation, Simmons v. United States, 390 U.S. 377, 394 (1968), considered whether a defendant must choose between his Fourth and Fifth Amendment rights. There, the FBI had conducted a search that netted a suitcase belonging to one of the defendants, Mr. Garrett, which contained incriminating evidence. Id. at 380-81. Mr. Garret faced the same type of dilemma as the Milewskis. Under the rules then obtaining, a motion to suppress the evidence as unconstitutionally procured would require Mr. Garrett to testify

---

[26] A sophisticated statutory scheme that deprives the Milewskis of either their Fourth or Fourteenth Amendment rights is no more acceptable than a blunt exercise of legislative authority that accomplishes the same thing. See, e.g., Lane v. Wilson, 307 U.S. 268, 275 (1939). ("The [Fifteenth] Amendment nullifies sophisticated as well as simple-minded modes of discrimination . . . .").

that the suitcase belonged to him, but if he did so and the motion failed, his suppression testimony could be used against him at trial. Id. at 389-91. The Court observed that, in contemplating his litigation strategy, "Garret was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination." Id. at 394. He opted for the suppression motion, which failed, and the government used his suppression testimony to obtain a conviction. See id. at 389. The Simmons Court recognized the "undeniable tension" this type of situation creates, and concluded that it is "intolerable that one constitutional right should have to be surrendered in order to assert another." Id. at 394.

¶66 The Eleventh Circuit Court of Appeals considered a similar undeniable tension, but there it was between the First and Fourth Amendments. Bourgeois v. Peters, 387 F.3d 1303 (11th Cir. 2004). Mr. Bourgeois wished to attend a political protest, but the city of Columbus, Georgia required all those entering the protest site to submit to a metal detector search. Id. at 1306-07. The City argued that relinquishing one of the constitutional rights was consensual because no one was under an obligation to attend the protest. See id. at 1324. Those who valued their speech and assembly rights more highly than their right to be free of unreasonable searches, the City said, would voluntarily submit to a search. See id. Those who valued their Fourth Amendment rights more highly would forego attendance at

46

the protest. See id. Either way, the potential attendees knew the price of exercising their rights, and chose accordingly. See id. There is more than an echo of this argument in the Court of Appeals opinion, which reasoned that the Milewskis "were well informed of the repercussions of refusing Gardiner's reasonable request to view the interior of their home, and Plaintiffs chose to abandon their right to challenge the tax assessment before the BOR." Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op., ¶21.

¶67 The Bourgeois court succinctly described the problem with this type of reasoning: "[T]he very purpose of the unconstitutional conditions doctrine is to prevent the Government from subtly pressuring citizens, whether purposely or inadvertently, into surrendering their rights." Bourgeois, 387 F.3d at 1324-25. It's troubling when the price of a discretionary governmental benefit is loss of a constitutional right; it's simply unacceptable when the State requires a person to sideline one constitutional right before exercising another. As the Bourgeois court observed, "[t]his case presents an especially malignant unconstitutional condition because citizens are being required to surrender a constitutional right—freedom from unreasonable searches and seizures—not merely to receive a discretionary benefit but to exercise two other fundamental rights—freedom of speech and assembly." Id. at 1324. Worse yet, there is no discernible principle that would limit the malignancy. "If the state may compel the surrender of one constitutional right as a condition of its favor, it may, in

47

like manner, compel a surrender of all." <u>Frost</u>, 271 U.S. at 594. We agree with the <u>Frost</u> Court's observation that "[i]t is inconceivable that guaranties embedded in the Constitution of the United States may thus be manipulated out of existence." <u>Id.</u>; <u>see also</u> <u>Smith v. Allwright</u>, 321 U.S. 649, 664 (1944) ("Constitutional rights would be of little value if they could be thus indirectly denied.").

¶68 The Milewskis exercised their right to deny the tax assessor's request to inspect the interior of their home. For the exercise of that constitutionally-protected right, they lost the ability to contest their increased tax burden.[27] The

---

[27] One of the concurrences favors resolving this case on statutory grounds——as a means of avoiding constitutional issues——by interpreting "view" in Wis. Stat. § 70.47(7)(aa) to mean only "exterior view." Chief Justice Roggensack's concurrence, ¶92 ("[I]nterpreting 'view such property' under Wis. Stat. § 70.47(7)(aa) to be satisfied by an exterior view of the property avoids the possibility that the statutory scheme would operate to infringe the due process rights of a taxpayer by denying the taxpayer the opportunity to be heard."). Because the Milewskis offered Gardiner an exterior view, the concurrence concludes, they satisfied the statute and should have been allowed to challenge the assessment. <u>Id.</u>, ¶97. But this resolution doesn't avoid the constitutional issue, it just avoids talking about it.

(continued)

constitution may not be put at odds with itself, and we do not countenance penalties on the exercise of constitutional rights.[28] Slochower v. Bd. of Higher Ed. of City of New York, 350 U.S. 551 (1956) (preventing local government from conditioning right to due process on disavowal of the Fifth Amendment protection against self-incrimination); Shelton v. Tucker, 364 U.S. 479 (1960) (preventing local government from conditioning employment on impairment of constitutionally-protected free association rights); see also Harman v. Forssenius, 380 U.S. 528, 540 (1965) ("It has long been established that a State may not impose a

---

The limiting construction the concurrence would place on "view," it says, is necessary to "save the constitutionality of the statutory scheme." Id., ¶94. It must have been the interior inspection that put the statute at risk because that's what the concurrence would exclude from the scope of the term "view." And although it didn't say why the interior view created constitutional peril, it must have been that it would violate the Fourth Amendment. If that were not so, then no "saving" construction would be necessary. So the Chief Justice must have concluded, just as we did, that a nonconsensual, warrantless interior inspection would violate the Fourth Amendment. The only difference between her conclusion and ours is that we said it aloud, while she said it sotto voce. We should say such things aloud.

[28] The dissent says revoking someone's due process rights is a reasonable "constitutional inducement" to obtain a person's consent to a search of one's home. See dissent, ¶170. Constitutionally valid consent, however, must be given freely and voluntarily. See State v. Artic, 2010 WI 83, ¶32, 327 Wis. 2d 392, 786 N.W.2d 430 ("The State bears the burden of proving that consent was given freely and voluntarily . . . ."). Stated in the negative, effective consent cannot be "the product of duress or coercion, express or implied . . . ." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). Threatening someone with the loss of a constitutional right sounds an awful lot like "duress or coercion."

penalty upon those who exercise a right guaranteed by the Constitution." (citing Frost, 271 U.S. at 593)).[29]  The Milewskis suffered an abridgement of their Fourteenth Amendment rights solely because they exercised their Fourth Amendment rights, which is a real and immediate constitutional injury.[30]

---

[29] The Harman Court considered a Virginia statute that forced voters to choose between (a) an onerous yearly registration process and (b) payment of a poll tax.  The Court observed that the latter option violated the 24th Amendment, while the former acted as a substantial encumbrance on "[t]he right to vote freely for the candidate of one's choice[, which] is of the essence of a democratic society . . . ."  Harman v. Forssenius, 380 U.S. 528, 540 (1965) (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)).  "Restrictions on that right," it said, "strike at the heart of representative government."  Harman, 380 U.S. at 540 (quoting Reynolds, 377 U.S. at 555).  So Virginia voters were faced with a Milewski-like conundrum: Submit to an unconstitutional poll tax, or suffer an encumbrance on the right to vote that strikes at the heart of representative government.  The Harman Court concluded Virginia could not put its citizens to that choice.

[30] One of the concurrences is concerned by our decision to opine on the "unconstitutional conditions doctrine" because it was not briefed.  Justice Ziegler's concurrence, ¶101.  It is fair to say this subject comprised virtually the entirety of the Milewskis' briefing.  As relevant here, the doctrine expresses the basic principle that the State may not put constitutional rights at odds with each other such that a person must surrender one as the price of exercising the other.  See, e.g., Slowchower v. Bd. of Higher Ed. of City of New York, 350 U.S. 551 (1956); Simmons v. United States, 390 U.S. 377 (1968); Bourgeois v. Peters, 387 F.3d 1303 (11th Cir. 2004).

That is precisely, and only, what the Milewskis argued. They said they have a due-process right to challenge their tax reassessment, they have the simultaneous right to prevent government agents from searching their home, and they said the statutes told them they had to choose between those rights.  We have not addressed anything the parties have not briefed.

(continued)

¶69  The only remaining question is whether application of Wis. Stat. §§ 70.47(7)(aa) and 74.37(4)(a) will invariably cause this injury under all circumstances.  If they will, we must declare them unconstitutional on their face to the extent they foreclose judicial review of a tax assessor's revaluation.[31]  If they do not, of necessity, inflict this injury, then the constitutional infirmity lies only in how they were applied to the Milewskis.  The Milewskis say their challenge is the latter, while the Town says the Milewskis are really arguing that the statutes are facially unconstitutional.

---

The concurrence also says existing cases demonstrate the unconstitutional conditions doctrine is applicable only when the State conditions access to a government-provided benefit upon surrender of a constitutional right.  Justice Ziegler's concurrence, ¶101.  While courts most frequently discuss the doctrine in that context, they also address it in the context of juxtaposed constitutional rights (as we described above).  In any event, concluding from this that the doctrine protects access to government benefits but not constitutional rights is to make government benefits a higher order of rights than those protected by our Constitutions.  Neither law nor logic supports such a proposition.

Finally, the concurrence agrees the Milewskis could not be constitutionally required to choose between their Fourth and Fourteenth Amendment rights.  Justice Ziegler's concurrence, ¶100.  But it does not explain how or why it would reach that conclusion without aid of the very principles it rejects.

[31] Soc'y Ins. v. LIRC, 2010 WI 68, ¶26, 326 Wis. 2d 444, 786 N.W.2d 385 ("[A] facial constitutional challenge attacks the law itself as drafted by the legislature, claiming the law is void from its beginning to the end and that it cannot be constitutionally enforced under any circumstances . . . .").

¶70 We find only that Wis. Stat. §§ 70.47(7)(aa) & 74.37(4)(a) were unconstitutionally applied to the Milewskis. The former provision states, in its entirety:

> No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.

Wis. Stat. § 70.47(7)(aa). The statute does not, by its express terms, say where the assessor will be when he conducts his "view" of the property. However, it does assume he will be somewhere that requires the owner's consent. If it were otherwise, there would be no need to ask permission——the assessor could simply conduct the "view" without contacting the owner at all. It is not immediately apparent to us that a Venn diagram of "places where an assessor may not be without consent" and "places the Fourth Amendment protects against unreasonable searches" would depict completely overlapping circles. To the extent they diverge, the statutory provision is not facially unconstitutional. This question was not addressed directly, and nothing in the parties' briefs indicates such a divergence is not possible, so we reserve for another day the determination of its facial soundness. We hold only that this statute may not be read to require a "viewing" that would violate the Fourth Amendment.

¶71 The parties have not identified any inherent constitutional infirmity in Wis. Stat. § 74.37(4)(a). This provision simply requires a property owner to comply with the

board of review procedures before filing a claim for excessive assessment in circuit court: "No claim or action for an excessive assessment may be brought under this section unless the procedures for objecting to assessments under [Wis. Stat. §] 70.47 . . . have been complied with." § 74.37(4)(a). In this case, however, those procedures included the Board of Review's determination that the Milewskis must submit to an unconstitutional search of their home before presenting their challenge. Because § 74.37(4)(a) incorporated the unconstitutional application of § 70.47(7)(aa), it too was unconstitutionally applied to the Milewskis.

## IV. CONCLUSION

¶72 Applying Wis. Stat. §§ 70.47(7)(aa) and 74.37(4)(a) in a manner that required submission to a tax assessor's search as a precondition to challenging the revaluation of their property violated the Milewskis' due process rights as guaranteed by the Fourteenth Amendment to the United States Constitution, and Article I section 1 of the Wisconsin Constitution. Consequently, we reverse the court of appeals and remand to the circuit court for further proceedings consistent with this opinion.

*By the Court.*—The decision of the court of appeals is reversed and the matter is remanded to the circuit court for further proceedings consistent with this opinion.

¶73 PATIENCE DRAKE ROGGENSACK, C.J. *(concurring).* I agree with the lead opinion that the Milewskis are entitled to a hearing to contest their tax assessment, and therefore I concur in the mandate. I write separately because I conclude that the Milewskis are statutorily entitled to a hearing even though they did not permit a tax assessor to enter the interior of their home. Therefore, because I would not address the constitutional issues discussed by the lead opinion, I do not join the lead opinion, but respectfully concur.

## I. BACKGROUND

¶74 The lead opinion ably sets forth relevant facts, and therefore I relay only those facts that are helpful to understanding my discussion that follows.

¶75 The Milewskis received a written notice that a tax assessor, Gardiner, would visit their home to view their property.[1] When Gardiner arrived, Ms. MacDonald permitted Gardiner to view the exterior of their home. She offered to let Gardiner through a gate and into their yard so that he could view the entire exterior of their home. Gardiner declined this invitation and left the property.

¶76 Gardiner valued the Milewskis' property significantly higher than it previously had been valued. Mr. Milewski appeared at the Town of Dover Board of Review (board of review) to object to the valuation of their property. The board of

---

[1] The notice requested an interior view of their home.

review denied Mr. Milewski the opportunity to appear because he had not permitted the assessor to view the interior of his home.

¶77 The Milewskis paid their taxes for 2013 and sought review of their tax assessment in circuit court under Wis. Stat. § 74.37. The Town of Dover Board of Review and Gardiner moved for summary judgment. They contended that the Milewskis lost their right to contest the valuation of their property before the board of review, and, as a corollary, the right to challenge their tax assessment as excessive in circuit court.

¶78 The Milewskis moved for partial summary judgment and argued, in part, that they were entitled to a hearing to object to their tax assessment because Wis. Stat. § 70.47(7)(aa) is satisfied by a taxpayer who permits an exterior view of his property, and the Milewskis permitted such a view.

¶79 The circuit court granted summary judgment in favor of the Town of Dover and Gardiner, and the court of appeals affirmed. We granted the Milewskis' petition for review. I would reverse the court of appeals and remand to the circuit court for a hearing on the Milewskis' excessive tax assessment claim.

## II. DISCUSSION

### A. Standard of Review

¶80 The present case requires the court to interpret and apply the statutory provisions that govern the valuation of real property and the ability of a taxpayer to contest a tax assessment. "Interpretation and application of a statute present questions of law that we review independently, while

2

benefitting from the analyses of the circuit court and court of appeals." Sorenson v. Batchelder, 2016 WI 34, ¶10, 368 Wis. 2d 140, 885 N.W.2d 362 (citing Pool v. City of Sheboygan, 2007 WI 38, ¶9, 300 Wis. 2d 74, 729 N.W.2d 415).

## B. Statutory Interpretation

¶81 "[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." Id., ¶45 (citing Bruno v. Milwaukee Cty., 2003 WI 28, ¶¶8, 20, 260 Wis. 2d 633, 660 N.W.2d 656).

¶82 These principles guide our interpretation of the three pertinent statutes in this case: Wis. Stat. § 70.32(1); Wis. Stat. § 70.47(7)(aa); and Wis. Stat. § 74.37. The circuit court and the court of appeals concluded that these provisions prevent the Milewskis from contesting the valuation of their home and the validity of their tax assessment.

¶83 Wisconsin Stat. § 70.32(1) describes the way in which an assessor is required to value real property. It provides, "Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information

3

that the assessor can practically obtain, at the full value which could ordinarily be obtained therefor at private sale." Wis. Stat. § 70.32(1). Therefore, there are two permissible ways in which an assessor may value real property: (1) through an actual view of the property; or (2) based on the best information available to the assessor. Of course, an assessor may rely on the best information available because an actual view of a property is not always feasible. See generally Boorman v. Juneau Cty., 76 Wis. 550, 45 N.W. 675, 676 (1890) ("We cannot hold that the mere failure of the assessor to value the lands from actual view invalidated the assessment.").

¶84 A taxpayer who is dissatisfied with the value accorded his real property is allowed to contest the valuation before a board of review. Wis. Stat. § 70.47. Section 70.47(7) outlines the process a taxpayer must follow to receive a hearing before a board of review. § 70.47(a) ("Objections to the amount or valuation of property shall first be made in writing and filed with the clerk of the board of review within the first 2 hours of the board's first scheduled meeting . . . .").

¶85 A hearing before a board of review allows a taxpayer to object to the valuation of his property; however, a taxpayer also has the option of claiming his tax assessment is excessive. Specifically, a taxpayer may pay the taxes that were imposed and sue for a refund in circuit court. Wis. Stat. § 74.37(1) ("In this section, a 'claim for an excessive assessment' or an 'action for an excessive assessment' means a claim or action, respectively, by an aggrieved person to recover that amount of

4

general property tax imposed because the assessment of property was excessive.").

¶86 Under Wis. Stat. § 70.47, a taxpayer is required to satisfy certain procedural requirements before he may obtain a hearing to object to the valuation of his property. And, a taxpayer who is procedurally barred from challenging the valuation of his property before a board of review is also precluded from seeking review of his tax assessment in circuit court. Wis. Stat. § 74.37(4)(a) ("No claim or action for an excessive assessment may be brought under this section unless the procedures for objecting to assessments under s. 70.47, except under s. 70.47(13), have been complied with.").

¶87 Wisconsin Stat. § 70.47(7) explains the ways in which an individual can lose the right to object to a tax assessment. For example, a taxpayer who refuses the request of an assessor to view his property is prevented from contesting the valuation of his property before a board of review and is likewise barred from challenging his tax assessment as excessive in circuit court. Wis. Stat. § 70.47(7)(aa). Therefore, if an assessor requests to "view" the taxpayer's real property, and the owner of the property refuses this request, the owner is prevented from taking any measure to challenge his tax assessment. Specifically, § 70.47(7)(aa) provides,

> No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.

5

Under this provision, an assessor may request the opportunity to view a taxpayer's property, but the assessor is not obligated to specify those parts of the property the assessor wishes to view. Accordingly, a "view" may include only the exterior, only the interior or both.

¶88 Although this provision requires an individual to permit an assessor to "view" his property, nothing in Wis. Stat. § 70.47(7)(aa) requires that a taxpayer permit an assessor to view the interior of his home. See State v. Pratt, 36 Wis. 2d 312, 317, 153 N.W.2d 18 (1967) ("In construing or 'interpreting' a statute the court is not at liberty to disregard the plain, clear words of the statute."). Rather, § 70.47(7)(aa) provides that an assessor must be given the opportunity to "view such property." And, the phrase "view such property" is not defined so as to require an interior view of the structures on the property in order for a view of the property to have occurred.

¶89 "View" or "viewing" is defined as "[t]o look at, examine, or inspect" or alternatively as "[a]n examination using the eyes; a look." View, The American Heritage Dictionary, 1931 (5th ed. 2011). An assessor may examine a taxpayer's property without entering the interior of his home. Therefore, an examination of a property for purposes of valuing said property does not necessarily require an assessor to view the interior of any structures located on the parcel of real property.

¶90 The legislature could have used the word "enter" instead of "view," which may have suggested that interior access

6

to any structures on the property is required. See Kalal, 271 Wis. 2d 633, ¶44 ("We assume that the legislature's intent is expressed in the statutory language."). It did not. But the legislature has used the word "enter" in other contexts involving the assessment of property. Wis. Stat. § 70.05(4m). "When the legislature chooses to use two different words, we generally consider each separately and presume that different words have different meanings." Augsburger v. Homestead Mut. Ins. Co., 2014 WI 133, ¶17, 359 Wis. 2d 385, 856 N.W.2d 874 (internal quotations omitted).

¶91 Importantly, nowhere else in the statutory scheme does it mandate an interior view of a taxpayer's property. And, this interpretation of Wis. Stat. § 70.47(7)(aa) does not prevent an assessor from correctly assessing the value of the home under Wis. Stat. § 70.32 or the Wisconsin Property Assessment Manual. If a taxpayer allows for an exterior view of the home, then that is "the best information that the assessor can practicably obtain." § 70.32.

¶92 Moreover, interpreting "view such property" under Wis. Stat. § 70.47(7)(aa) to be satisfied by an exterior view of the property avoids the possibility that the statutory scheme would operate to infringe the due process rights of a taxpayer by denying the taxpayer the opportunity to be heard.

¶93 The lead opinion's due process analysis is predicated on the presumption that Wis. Stat. § 70.47(7)(aa) precludes the right to be heard for a taxpayer who denies an assessor a view of any part of his home. However, we generally avoid

interpreting a statute in a way that would cause constitutional problems. See Blake v. Jossart, 2016 WI 57, ¶27, 370 Wis. 2d 1, 884 N.W.2d 484 ("We presume that statutes are constitutional and if any doubt exists about the statute's constitutionality, the court must resolve that doubt in favor of upholding the statute." (internal citations omitted)).

¶94 Even if the plain language of the statute could be read to require interior access to a taxpayer's property, interpreting the statute such that it is satisfied by an exterior view preserves its constitutionality. See Milwaukee Branch of NAACP v. Walker, 2014 WI 98, ¶63, 357 Wis. 2d 469, 851 N.W.2d 262. "If a saving construction . . . preserves the constitutionality of the statute, we will employ it." Id. "We do so in order to avoid a constitutional conflict." Id., ¶64. "Stated otherwise, when we determine that there is a statutory flaw that may have constitutional significance, we ascertain whether the government rule or statute can be interpreted in a manner that will avoid a constitutional conflict." Id. As discussed above, it is possible to interpret the statute such that an exterior view of a taxpayer's property is sufficient. This interpretation allows a taxpayer a hearing to contest his tax assessment if he permits an exterior view of his property, thereby rendering the statutory scheme constitutional. Accordingly, this court should interpret Wis. Stat. § 70.47(7)(aa) such that an exterior view of the property is sufficient in order to "save" the constitutionality of the statutory scheme.

8

¶95 Consequently, I would interpret Wis. Stat. § 70.47(7)(aa) consistent with a taxpayer's due process right to be heard. The interpretation accords a taxpayer who permits an exterior view of his property a hearing under § 70.47(7)(aa) and also the right to maintain a refund action under Wis. Stat. § 74.37.

¶96 However, a taxpayer who provides only an external view of his property is not entitled to produce evidence of the interior condition of his home at a hearing before the board of review or in a claim for excessive assessment before a circuit court. During those proceedings, the taxpayer may cross-examine the individual who valued his property to determine if the assessor came to a reasonable conclusion as to its value.[2] Through this process, a taxpayer will be able to determine if the assessor relied on the best information available to assess his property, as required under Wis. Stat. § 70.32(1). Additionally, a taxpayer may introduce other evidence unrelated to the interior condition of the property to show his tax assessment was unjust or unreasonable.

---

[2] Assessors, or an authorized representative of the assessor, are required to attend such a hearing. See Wis. Stat. § 70.48 ("The assessor or the assessor's authorized representative shall attend without order or subpoena all hearings before the board of review and under oath submit to examination and fully disclose to the board such information as the assessor may have touching the assessment and any other matters pertinent to the inquiry being made.").

## C. Milewskis' Tax Assessment

¶97 In the present case, the Milewskis satisfied the conditions of Wis. Stat. § 70.47(7)(aa), and therefore they are entitled to challenge their tax assessment as excessive under Wis. Stat. § 74.37. When the assessor, Gardiner, arrived at their home, Ms. MacDonald offered to provide the inspector with an exterior view of their home. She offered to open the gate to their yard and let him view the entirety of the exterior. As a result, she offered to let Gardiner "view" the property, which is all that § 70.47(7)(aa) requires in order for a taxpayer to obtain a hearing before a board of review. It is of no consequence that Gardiner declined the Milewskis' invitation to examine the exterior of their home.

¶98 Therefore, the Milewskis satisfied the conditions necessary to be able to challenge their taxes as excessive in circuit court under Wis. Stat. § 74.37. I would remand to the circuit court for a hearing on this claim. However, during the hearing, the Milewskis are not entitled to present evidence as to the condition of the interior of their home. Instead, they may examine Gardiner in order to determine the validity and soundness of the methodology upon which he based the valuation of their property. Additionally, they may introduce other evidence of the value of their property as appropriate.

## III. CONCLUSION

¶99 In light of the foregoing, I conclude that the Milewskis are statutorily entitled to a hearing even though they did not permit a tax assessor to enter the interior of their

10

home.  Therefore, because I would not address the constitutional issues discussed by the lead opinion, I do not join the lead opinion, but respectfully concur.

¶100 ANNETTE KINGSLAND ZIEGLER, J. *(concurring).* I respectfully concur in the mandate. I agree with the result reached by the lead opinion in this case, as well as the lead opinion's basic rationale and much of the lead opinion's analysis. That is, I agree that the Town could not, consistent with the United States Constitution and the Wisconsin Constitution, compel the Milewskis to choose between exercising their constitutional right to challenge a governmental deprivation of their property and exercising their constitutional right to refuse governmental entry into their home. This Scylla and Charybdis, however, has seemingly been analyzed under the rubric of the "unconstitutional conditions doctrine" by the lead opinion. I am concerned with this characterization.

¶101 I concur only in the mandate principally because of the lead opinion's unprecedented decision to rely on the "unconstitutional conditions doctrine," a term absent from the briefing in this case. The perils of addressing unbriefed issues are illustrated by the lead opinion's discussion. A review of existing case law demonstrates that the unconstitutional conditions doctrine is more complex than the lead opinion's analysis suggests, and that it has most typically, if not always, according to the Supreme Court, arisen in cases which involve government benefits. See, e.g., Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. ___, 133 S. Ct. 2586, 2594 (2013) ("We have said in a variety of contexts that 'the government may not deny a benefit to a person because he

1

exercises a constitutional right.' . . . Those cases reflect an overarching principle, known as the unconstitutional conditions doctrine, that vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." (emphasis added)); id. at 2596 ("Virtually all of our unconstitutional conditions cases involve a gratuitous governmental benefit of some kind."); Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't Health, 699 F.3d 962, 986 (7th Cir. 2012) ("The first step in any unconstitutional-conditions claim is to identify the nature and scope of the constitutional right arguably imperiled by the denial of a public benefit." (emphasis added)); Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶¶29-35, 358 Wis. 2d 1, 851 N.W.2d 337 (suggesting that the unconstitutional conditions doctrine embodies the principle that "it is impermissible for the government to condition the receipt of a tangible benefit on the relinquishment of a constitutionally protected right" (emphasis added)); Kathleen M. Sullivan, Unconstitutional Conditions, 102 Harv. L. Rev. 1413, 1415 (1989) ("The doctrine of unconstitutional conditions holds that government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether." (emphasis added)).[1]

---

[1] For example, the lead opinion pulls language from Frost & Frost Trucking Co. v. Railroad Commission of California, 271 U.S. 583, 592-93 (1926). That case was an unconstitutional conditions case, but it involved a "gratuitous governmental benefit." Koontz v. St. Johns River Water Mgmt. Dist., 570 U.S. ___, 133 S. Ct. 2586, 2596 (2013).

2

¶102 Perhaps this doctrine should be applied in this case (which does not involve a governmental benefit), but I would prefer to see briefing and argument on that question before establishing a rule in Wisconsin. Experience teaches that broad legal statements untethered to the specific facts of the case, like those present in the lead opinion's section on the unconstitutional conditions doctrine, can easily metastasize in our legal system and become "virtual engine[s] of destruction for countless legislative judgments which have heretofore been thought wholly consistent with . . . the Constitution." Weinberger v. Salfi, 422 U.S. 749, 772 (1975) (discussing the irrebuttable presumption doctrine). Judicial restraint dictates that we decide this case narrowly, especially given the numerous constitutional considerations involved.[2]

¶103 Aside from this deficiency, other aspects of the lead opinion suffer from the same proclivity for overbroadness. For instance, the lead opinion is not content to reject the argument that home intrusions of the type involved under the specific facts at issue are minor; it instead concludes that no governmental entry into a home under any hypothetical set of circumstances can ever be minor. See lead op., ¶57. The statement sounds impressive, but I do not understand the need for such sweeping remarks. While the lead opinion may be

---

[2] I do not necessarily reject all of the principles provided in the lead opinion's discussion. I simply disagree with the lead opinion's use of the unconstitutional conditions doctrine to resolve this case.

entirely correct, I am not willing to decide an infinite number of potential future cases without briefing and argument. To take another example, while the lead opinion could easily quote well-established Fourth Amendment maxims for some of the principles it cites in its opinion, it instead chooses to reword them in ways that could be easily misunderstood. See, e.g., lead op., ¶37 ("[C]onsent removes the search from Fourth Amendment scrutiny.").

¶104 In sum, while I would like to join the lead opinion, I cannot do so for fear of its potential effects on existing case law and the ways in which it could be cited in the future.

¶105 For the foregoing reasons, I respectfully concur in the mandate.

¶106 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this opinion.

¶107 SHIRLEY S. ABRAHAMSON, J. *(dissenting)*.[1] I would affirm the judgment of the circuit court and the decision of the court of appeals in favor of the Town of Dover.[2] The statutes challenged are presumed constitutional. The challengers have

_____

[1] Five justices agree with the mandate set forth in Justice Daniel Kelly's opinion (which appears as the first opinion in the instant case). The mandate is that the decision of the court of appeals is reversed and the cause is remanded. Only Justice Rebecca G. Bradley joins Justice Kelly's opinion. Chief Justice Patience D. Roggensack joins Justice Kelly's mandate, writing separately in concurrence. Justice Annette K. Ziegler (joined by Justice Michael J. Gableman) joins Justice Kelly's mandate, writing separately in concurrence. Justice Ann Walsh Bradley joins this dissent.

Justice Kelly's opinion is referred to as a lead opinion because four justices do not agree with or join its reasoning.

As Justice Ann Walsh Bradley recently explained in State v. Weber, 2016 WI 96, ¶83 n.1, 372 Wis. 2d 202, 887 N.W.2d 554 (Ann Walsh Bradley, J., dissenting), although "the term 'lead' opinion . . . is undefined in our Internal Operating Procedures, its use here is consistent with past description. We have said 'that a lead opinion is one that states (and agrees with) the mandate of a majority of the justices, but represents the reasoning of less than a majority of the participating justices.'" (quoting State v. Lynch, 2016 WI 66, ¶143, 371 Wis. 2d 1, 885 N.W.2d 89 (Abrahamson & Ann Walsh Bradley, JJ., concurring in part and dissenting in part) (citing Hoffer Props., LLC v. DOT, 2016 WI 5, 366 Wis. 2d 372, 874 N.W.2d 533)).

[2] The parties disagree whether the Milewskis made a facial or an as-applied challenge to the constitutionality of the statutes. The lead opinion agrees with the Milewskis that their challenge is an as-applied challenge. Lead op., ¶¶69-71. I am not persuaded. I caution, as the United States Supreme Court has cautioned, that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010).

not carried their heavy burden to prove the statutes unconstitutional beyond a reasonable doubt.[3]

¶108 The legislature has declared that if a real property owner wishes to contest the amount of an assessment at the board of review or circuit court, the property owner must, on the reasonable written request of the assessor, allow the assessor an "actual view" of the real property. See Wis. Stat. §§ 70.47(7)(aa), 70.32(1).

¶109 The statutory words "actual view" have been interpreted as including both an interior and exterior view of the real property.[4] The instant case involves the Milewskis'

---

[3] The Milewskis bear a heavy burden. See Tammy W.-G. v. Jacob T., 2011 WI 30, ¶46, 333 Wis. 2d 273, 299, 797 N.W.2d 854 ("In a facial challenge, the challenger must persuade us that the 'heavy burden' to overcome the presumption of constitutionality has been met, and that there is proof beyond a reasonable doubt that the statute is unconstitutional"); Clear Channel Outdoor, Inc. v. City of Milwaukee, 2017 WI App 15, ¶33, 374 Wis. 2d 348, 893 N.W.2d 24 (noting "the heavy burden challengers face on an as-applied equal protection claim and the strong presumption in favor of a taxing decision of government").

[4] The Wisconsin Property Assessment Manual interprets "actual view" of property to include an "interior view." See Wisconsin Property Assessment Manual at 4-3, 10-55, 21-18 to 21-20 (2017).

All subsequent references to the Manual are to the 2017 version. For a discussion of the Manual, see ¶¶143-145, infra.

At least as early as the 1860s the legislature has required assessors to value real property upon actual view. Marsh v. Bd. of Supervisors, 42 Wis. 502, 514 (1877). The Marsh court concluded that the requirement of an actual view and the statutory enumerated factors the assessor must consider help ensure "an equal and faithful assessment of all property subject to taxation."

2

refusing to allow the assessor to view the interior of their real property, a home. I therefore focus on this issue, as does the lead opinion. Other taxpayers may refuse to give an assessor a view of the exterior of the real property or both the exterior and interior. Substantially the same or similar issues may arise in these instances.[5]

¶110 The lead opinion asserts that the legislature has conferred on the Milewskis an unconstitutional choice of Option A or Option B:

¶111 If the Milewskis choose Option A, they consent to an assessor's viewing the interior of their home (thereby forgoing their Fourth Amendment right to bar the government from their home) and can contest the amount of the assessment in a hearing before the Board of Review and a court (thereby exercising their Fourteenth Amendment due process right to a hearing to contest the amount of the assessment).

¶112 If the Milewskis choose Option B, they refuse to allow an assessor to view the interior of their home (thereby exercising their Fourth Amendment right to bar the government

---

[5] Chief Justice Patience Roggensack's concurrence offers an unexpected and surprising interpretation of the phrases "actual view" and "view such property" in Wis. Stat. §§ 70.32(1) and 70.47(7)(aa), respectively. The concurrence contends that these phrases do not refer to an interior view of the real property. This interpretation (not proffered by the parties) does not resolve the issue of the constitutionality of the statutes at issue when the property owner does not allow an assessor a view of the exterior of the real property, which is curtilage. See Oliver v. United States, 466 U.S. 170 (1984); State v. Dumstrey, 2016 WI 3, 366 Wis. 2d 64, 873 N.W.2d 502.

from their home) and cannot contest the amount of the assessment in a hearing before the Board of Review and a court (thereby forgoing their Fourteenth Amendment due process right to a hearing to contest the amount of the assessment, according to the lead opinion).

¶113 I conclude that an assessor's entry into the interior of the home is a search under the Fourth Amendment. I further conclude, as did the circuit court and court of appeals, that Wis. Stat. § 70.47(7)(aa) and § 74.37(4)(a), the challenged statutes, do not violate the Milewskis' Fourth Amendment or Fourteenth Amendment rights (or analogous state constitutional rights).

¶114 Section 70.47(7)(aa) governs proceedings before the board of review and bars a person who refuses to allow an assessor to view property from appearing or testifying before the board or contesting the amount of the assessment:

> **(aa)** No person shall be allowed to appear before the board of review, to testify to the board by telephone or to contest the amount of any assessment of real or personal property if the person has refused a reasonable written request by certified mail of the assessor to view such property.

¶115 Section 74.37(4)(a) governs proceedings before the circuit court and bars a claim or action for an excessive assessment unless the property owner complied with the procedure for objecting to assessments prescribed in § 70.47(7)(aa):

> (a) No claim or action for an excessive assessment may be brought under this section unless the procedures for objecting to assessments under s. 70.47, except under 70.47(13), have been complied with. . . .

4

¶116 Wisconsin is not alone in tying a challenge to the amount of a property assessment to a property owner's permitting a taxing authority to view the real property.[6]

¶117 Although the lead opinion describes its task as "straightforward," it engages in a lengthy, overly complex discussion. It focuses on numerous intricacies, including the special needs exception to the Fourth Amendment and the messy, ill-understood "unconstitutional conditions" doctrine.[7] It misses the big picture as well as the components of the tax assessment statutes.[8]

¶118 My analysis of the issues proceeds as follows:

¶119 Part I sets forth two realities essential to understanding the instant case: The Milewskis did not surrender their Fourth Amendment rights; the assessor never entered the home. The Milewskis retain rights under the statutes to a due process hearing in which to contest their assessment; they exercised these rights.

---

[6] See, e.g., Minn. Stat. §§ 273.20, 274.01(b) (2016); Mass. Gen. Laws, ch. 58A, § 8A (2016).

[7] Justice Annette Ziegler's concurrence appropriately outlines some difficulties with the "unconstitutional conditions" doctrine, but much more can be said about the unworkability of the doctrine and the flaws in the lead opinion's discussion of this doctrine.

[8] "[T]he tax appeal administrative procedures of chs. 70 and 74 of the Wisconsin statutes are a highly evolved and carefully interwoven set of statutes providing a comprehensive remedy for individuals seeking redress for excessive assessments." Hermann v. Town of Delavan, 215 Wis. 2d 370, 394, 572 N.W.2d 855 (1998).

¶120 In Part II, I examine Wis. Stat. § 70.32(1) and determine that the legislative directions to assessors regarding the methods of valuation express a preference for an "actual view" of the real property, meaning the view of the interior and exterior. The lead opinion rests on a fundamental misinterpretation of § 70.32(1).

¶121 Part III examines the legislature's reasonable, constitutional inducement to property owners to consent to an assessor's actual view of the real property by imposing a reasonable, constitutional restraint on the property owner's ability to contest the amount of an assessment. The legislative provisions advance significant, legitimate governmental objectives.

¶122 In Part IV, I analogize the challenged tax statutes to Wisconsin's Implied Consent Law by which the State has imposed a choice on drivers. The effect of this constitutional choice is to discourage a driver's exercise of a Fourth Amendment right to be free from intrusive government searches of the person by a blood draw.

¶123 In Part V, I show that the challenged tax statutes are but a specific application of the unremarkable principle that a taxpayer must make full disclosure of material information to a taxing authority or face civil tax consequences for failing to divulge the information. This principle of "make a full disclosure or lose a claim or defense" also exists in other areas of the law.

6

¶124 Part VI concludes the analysis by probing the meaning of the mandate of the lead opinion.

I

¶125 The reader should approach the instant case keeping two realities firmly in mind:

¶126 One. the Town's assessor did not enter the interior of the Milewskis' home. No search of the Milewskis' home occurred.[9] And no search would have occurred without their express consent. The Milewskis did not surrender any constitutional right to be free from an unreasonable search.[10]  See lead op., ¶¶6-12.

---

[9] The circuit court observed that no search occurred:

Circuit Court:  [Milewski] here very nicely says:  You can come——you can come in the yard, you can look around, but you can't go in.  They don't go in, do they?

Milewski's Attorney:  No, they do not.

Circuit Court:  So there's no Fourth Amendment violation at all.

Milewski's Attorney:  There's no search.

[10] Wisconsin Stat. § 70.05(4m) limits the availability and scope of an assessor's entry to view a property:

A taxation district assessor may not enter upon a person's real property for purposes of conducting an assessment under this chapter more than once in each year, except that an assessor may enter upon a person's real property for purposes of conducting an assessment under this chapter more often if the property owner consents.  A property owner may deny entry to an assessor if the owner has given prior notice to the assessor that the assessor may not enter the property without the property owner's permission.

(continued)

¶127 No assessor forced his or her way into the home, enlisted the aid of law enforcement officers to enter the home, or otherwise interfered with the Milewskis' exercise of their right to deny an assessor entry into the home. No physical occupation or entry without a warrant[11] or without consent occurred, was attempted, or was even contemplated.[12]

¶128 Two, the Milewskis have received full due process hearings in three courts——in the circuit court, in the court of appeals, and in this court. Furthermore, the Milewskis retained and exercised rights under the statutes to a hearing in which they challenged the assessment as excessive on specified grounds.

¶129 The lead opinion misleadingly suggests that the Milewskis have been subjected to a tax and "have been forbidden any process by which to challenge it." Lead op., ¶24. Three

_____

Any request to view the interior of the property must be reasonable, made in writing, and delivered by certified mail. Wis. Stat. § 70.47(7)(aa).

[11] Wisconsin Stat. § 66.0119 provides for "special inspection warrants" for many purposes, including "property assessment."

In Camara v. Mun. Court, 387 U.S. 523 (1967), the Court required a municipal health inspector to obtain a warrant to conduct routine interior inspections for evidence of building code violations.

[12] Compare G.M. Leasing Corp. v. United States, 429 U.S. 338, 358 (1977) (concluding that the government's nonconsensual search of a business office and seizure of furnishings, books, and records contained therein was unreasonable and in violation of the Fourth Amendment absent a warrant or exigent circumstances).

8

courts have addressed the Milewskis' objections to the assessment of their home and their challenge to the statutes at issue. The Milewskis went the "whole nine yards" and lost on the merits in two courts.

¶130 Moreover, the lead opinion misleadingly suggests that as a result of the challenged statutes, the Milewskis lose "the ability to contest their increased tax burden." Lead op., ¶¶24 n.9, 68. But property owners who refuse to allow an assessor an actual view of the real property may nevertheless avail themselves of procedures to challenge the legitimacy, nature, and scope of the assessment.

¶131 Indeed, the Milewskis availed themselves of their statutory right to a hearing challenging the assessment as excessive. The Milewskis brought claims against Gardiner Appraisal Service, LLC, the Town's assessor. They had a due process hearing in circuit court in which they sought damages from the Town's assessor on a claim of excessive assessment and retaliation or coercion.[13] See Wis. Stat. § 70.503.[14]

---

[13] The Wisconsin statutes include protection against intentional (retaliatory) assessments. Should an assessor attempt to punish a property owner by imposing a punitive assessment, the assessor risks not only a fine but liability for the amount of the excess tax imposed on the property owner.

[14] Wisconsin Stat. § 70.503 provides for civil liability of an assessor as follows:

Civil liability of assessor or member of board of review. If any assessor, or person appointed or designated under s. 70.055 or 70.75, or any member of the board of review of any assessment district is guilty of any violation or omission of duty as specified in ss. 70.501 and 70.502, such persons shall

(continued)

9

¶132 The court of appeals affirmed the circuit court's dismissal of these retaliatory assessment claims against Gardiner Appraisal Service, holding that there was no evidence that Gardiner Appraisal Service intentionally violated the law by performing the assessment in a retaliatory manner.[15] The Milewskis did not seek review of this dismissal in this court.

¶133 Property owners also have the right to a due process hearing if they claim that the request to view the interior of the real property was unreasonable. See Wis. Stat. §§ 70.05(4m), 70.47(7)(aa). The Milewskis do not assert that

---

be liable in damages to any person who may sustain loss or injury thereby, to the amount of such loss or injury; and any person sustaining such loss or injury shall be entitled to all the remedies given by law in actions for damages for tortious or wrongful acts. . . .

Wisconsin Stat. § 70.501 provides for an assessor's forfeiture to the state:

Fraudulent valuations by assessor. Any assessor, or person appointed or designated under s. 70.055 or 70.75, who intentionally fixes the value of any property assessed by that person at less or more than the true value thereof prescribed by law for the valuation of the same, or intentionally omits from assessment any property liable to taxation in the assessment district, or otherwise intentionally violates or fails to perform any duty imposed upon that person by law relating to the assessment of property for taxation, shall forfeit to the state not less than $50 nor more than $250.

[15] See Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op., ¶¶22-25 (Wis. Ct. App. May 4, 2016).

10

the assessor's written request to view their real property violated the statutory requirements.[16]

¶134 To be clear, the Milewskis were afforded due process of law. The Milewskis challenged in the courts the tax assessment system that led to the assessment of their real property. The Milewskis also had statutory rights to the Board of Review's determination of whether the assessment of their property was excessive and retaliatory and whether the request for an actual view of their property violated statutory requirements.

¶135 Two realities: No search of the Milewskis' home occurred. The Milewskis had a hearing under the statutes, and they challenged the assessment as excessive in court proceedings.

II

¶136 The task of prescribing a uniform method for valuing property for taxation purposes lies with the legislature. Since the 19th century, the legislature has directed assessors how to value real property. The present statute is Wis. Stat. § 70.32(1).

---

[16] Any request to view the property must be reasonable, made in writing, and delivered by certified mail. Wis. Stat. § 70.47(7)(aa). The Milewskis do not assert that they were unable to permit a view at the suggested time. Indeed, had this been their reason for refusing the assessor a view of the interior of the home, the Milewskis would have been given a chance to reconsider their refusal, even after seeing the proposed assessment. See Wisconsin Property Assessment Manual at 21-16.

¶137 The lead opinion rests on a fundamental misinterpretation of Wis. Stat. § 70.32(1).

¶138 The lead opinion concludes that an assessment can be based either on an actual view or on the best information that the assessor can practicably obtain, and that the legislature has not expressed a preference for one method over the other. The inevitable result of this reading is that the property owner can dictate the valuation methodology by refusing to allow an assessor an actual view of the real property.

¶139 The lead opinion at ¶51 reaches this interpretation by relying solely on the text of the phrase "from actual view or from the best information that the assessor can practicably obtain" in the first sentence of Wis. Stat. § 70.32(1):

> **70.32 Real Estate, How Valued** (1) Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under [Wis. Stat. §] 73.03(2a) from actual view or from the best information that the assessor can practicably obtain . . . . (Emphasis added.)

¶140 This narrow, either/or reading of the statute based on the text of only one phrase in a lengthy statutory provision contravenes the basic rule of statutory interpretation that a statute be interpreted in context.[17] Rather than reading this phrase in isolation, it should be read in the context of the entire section, in the context of the tax assessment statutes,

---

[17] See Wis. Carry v. City of Madison, 2017 WI 19, ¶20, 373 Wis. 2d 543, 892 N.W.2d 233 ("We examine the statute's contextualized words, put them into operation, and observe the results to ensure we do not arrive at an unreasonable or absurd conclusion.").

12

in the context of prior judicial interpretation of the statute, and to avoid unreasonable or absurd consequences.[18] This court has instructed that the appropriate valuation methodology is determined by looking "at the governing statutes, reviewed in conjunction with basic principles of real property assessment as described by case law, treatises, and the [Wisconsin] Property Assessment Manual."[19]

¶141 Section 70.32(1) of the Wisconsin Statutes provides in full as follows:

> Wis. Stat. § 70.32 (1) Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value, the assessor shall consider recent arm's-length sales of the property to be assessed if according to professionally acceptable appraisal practices those sales conform to recent arm's-length sales of reasonably comparable property; recent arm's-length sales of reasonably comparable property; and all factors that, according to professionally acceptable appraisal practices, affect the value of the property to be assessed. (Emphasis added.)

¶142 A reading of the full text of Wis. Stat. § 70.32(1) demonstrates that the legislature has given assessors several instructions about valuation of real property that inform the

---

[18] See, e.g., Berkos v. Shipwreck Bay Condo. Ass'n, 2008 WI App 122, ¶8, 313 Wis. 2d 609, 758 N.W.2d 215 ("Also relevant to a statute's plain meaning is prior case law interpreting the statute.")

[19] Walgreen Co. v. City of Madison, 2008 WI 80, ¶19, 311 Wis. 2d 158, 752 N.W.2d 687.

interpretation of the statute's phrase "actual view or from the best information that the assessor can practicably obtain":

- The legislature has instructed assessors to value real property according to the Wisconsin Property Assessment Manual.

- The legislature has instructed assessors to value real property according to "professionally acceptable appraisal practices."

- The legislature has instructed assessors to use a hierarchy of valuations to value real property.

- As judicially interpreted, the legislature has expressed a preference for valuation on the basis of an actual view of the real property, although the legislature has recognized that valuation requires attention to other enumerated statutory factors and the judgment and expertise of the assessor.

¶143 The first statutory direction to assessors in Wis. Stat. § 70.32(1) is that real property be valued in the manner specified in the Wisconsin Property Assessment Manual. The Manual is published annually by the Department of Revenue. The legislature envisions the Manual as setting forth accepted assessment methods and reflecting advances in the science of assessment, court decisions, and other information considered valuable to local assessors. Wisconsin Stat. § 73.03(2a) provides in relevant part as follows:

> The manual shall discuss and illustrate accepted assessment methods, techniques and practices with a view to more nearly uniform and more consistent assessments of property at the local level. The

14

manual shall be amended by the department from time to time to reflect advances in the science of assessment, court decisions concerning assessment practices, costs, and statistical and other information considered valuable to local assessors by the department.

¶144 Assessors must adhere to the Manual, but when an assessment is based on a directive in the Manual that does not properly interpret Wisconsin law, the assessment may be erroneous as a matter of law.[20]

¶145 The Wisconsin Property Assessment Manual mandates that "actual view requires a detailed viewing of the interior and exterior of all buildings and improvements and the recording of complete cost, age, use, and accounting treatments." See Wisconsin Property Assessment Manual at 10-55.[21] This interior view requirement makes sense. The assessor hired by the Town of Dover in the instant case asserts that the interior of a home constitutes about 70% of its value.[22]

---

[20] Metro. Holding Co. v. Bd. of Review, 173 Wis. 2d 626, 632, 495 N.W.2d 314 (1993).

[21] That an actual view requires an assessor to view the interior of real property is an observation echoed throughout the Wisconsin Property Assessment Manual. For example, at 6-12, the Manual explains that "data collected on each property should be complete, accurate, and consistent," requiring, inter alia, that the assessor "[v]iew the interior of the building, recording physical data." The Manual explains further that "[p]hysical characteristics such as age, condition, design, layout, quality of construction materials, and workmanship all have an effect on the value of improvements." Wisconsin Property Assessment Manual at 9-20. These characteristics necessarily depend on an interior view.

[22] Gardiner Appraisal Service is a party in the instant case and filed a brief.

15

¶146 The lead opinion maintains that there is no need for an interior inspection of the Milewski home. Lead op. ¶¶51-52. Wrong! There is!

¶147 An assessor for the Town of Dover was last in the interior of the Milewskis' residence in 2004. According to its affidavit, Gardiner Appraisal Services could not verify whether any remodeling had been performed since then. Thus, when the assessor attempted to set a valuation for the Milewskis' house without an interior inspection, he "could not accurately determine the effective physical, functional and economic obsolescence of the structure, curable or non-curable. . . . A single remodel project, like a kitchen or bath, could have significantly increased the value of the home."[23]

¶148 A second reason a view of the interior of the Milewskis' home was especially crucial is that the Town was conducting a full revaluation of all real property in the Town's jurisdiction. A full revaluation refers to an assessment of all the real property in the Town. See Wis. Stat. §§ 70.045, 70.05(5). A full revaluation is required periodically "to meet the requirements of fair and uniform assessment." Wisconsin Property Assessment Manual at 4-1.

¶149 Accordingly, the assessor in the instant case, Gardiner Appraisal Services, performed the appraisal of the Milewskis' house while doing a full revaluation of all the real property in the Town of Dover to establish new, equitable

---

[23] Defendant-Respondent, Gardiner Appraisal Service, LLC's, Response Br. at 8.

16

assessments for all real properties. The written contract between the Town of Dover and Gardiner Appraisal Services required, inter alia, that "[the] assessor[] will view the exterior and interior of all structures unless denied access after mailing a request to owner by certified mail."

¶150 Requiring assessors to undertake an actual view of the real property in a revaluation is a valid and reasonable application of Wis. Stat. § 70.32(1), the Manual, and professional appraisal practices.

¶151 The second direction in Wis. Stat. § 70.32(1) to assessors regarding valuation is that the assessors comply with "professionally acceptable appraisal practices." Emphasizing the importance of the phrase, the statute references "professionally acceptable appraisal practices" three times. In its last use of the phrase, Wis. Stat. § 70.32(1) explicitly states that "[i]n determining the value . . . <u>the assessor shall consider . . . all factors that, according to professionally acceptable appraisal practices</u>, affect the value of the property to be assessed."

¶152 The Department of Revenue is directed to illustrate accepted assessment methods in the Manual. Wis. Stat. § 70.03(2a).

¶153 Viewing the interior of a building is surely a "professionally acceptable appraisal practice." Gardiner Appraisal Service's brief and affidavit cite (and include

17

excerpts from) the Appraisal Institute's[24] text Appraisal of Real Estate at 219-20 (14th ed. 2013), which Gardiner Appraisal Services describes as "a widely accepted treatise on assessment methods."[25]

¶154 The text states that "the importance of a site visit should not be underestimated." An appraiser's primary task during a site visit is to write a "thorough building description" that "helps the appraiser identify the extent and

---

[24] The Appraisal Institute describes itself as "the world's leading organization of professional real estate appraisers," and "has led the way in fostering and promoting the highest standards of [appraisal] practice through its designation programs, peer review process, education, research and publishing endeavors." See http://www.appraisalinstitute.org/about/.

[25] This text has been cited in numerous Wisconsin cases in which an appraisal or appraisal technique has been at issue. See, e.g., Walgreen Co. v. City of Madison, 2008 WI 80, ¶3, 311 Wis. 2d 158, 164-65, 752 N.W.2d 687, 690 ("This holding is consistent with the nationally recognized principle that '[a] lease never increases the market value of real property rights to the fee simple estate.' Appraisal Institute, The Appraisal of Real Estate 473 (12th ed. 2001)."); ABKA Ltd. P'ship v. Bd. of Rev. of Vill. of Fontana-on-Geneva Lake, 231 Wis. 2d 328, 354, 603 N.W.2d 217 (1999) (Wilcox, J., dissenting) (citing The Appraisal Institute, The Appraisal of Real Estate 478 (11th ed. 1996)); Vivid, Inc. v. Fiedler, 219 Wis. 2d 764, 781, 580 N.W.2d 644 (1998) (citing The Appraisal Institute, The Appraisal of Outdoor Advertising Signs (1994)). See also Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶114 n.29, 294 Wis. 2d 441, 717 N.W.2d 803 (Abrahamson, C.J., dissenting) (citing Ron L. Nation & Donald P. Oehlrich, The Valuation of Billboard Structures, The Appraisal Journal, Oct. 1999, at 242 (publication of the Appraisal Institute).

Reference was also made to another Appraisal Institute publication titled Summary Appraisal Report: Residential (2013) for similar statements.

quality of building improvements, calculate their cost, and identify physical deterioration and functional obsolescence." The Appraisal of Real Estate at 220-21.

¶155 Further emphasizing the importance of an exterior and interior view of real property as a professionally acceptable appraisal practice, the text goes on to explain that if a site visit was not made, the appraisal report must clearly and conspicuously describe the "extraordinary assumption that the site and building characteristics are as described even though the appraiser has not confirmed that information through a site visit." The Appraisal of Real Estate at 220.

¶156 This expressed, explicit distrust of an appraisal conducted without an exterior and interior view strongly supports the proposition that an on-site inspection is a professionally accepted appraisal practice; valuations made without on-site inspections should be the exception and not the rule for professional appraisers.[26]

¶157 An actual view of the interior and exterior of a building is, without question, a professionally acceptable appraisal technique.

¶158 The third legislative direction in Wis. Stat. § 70.31(1) to assessors regarding valuation of real property is that they comply with the hierarchy of valuation methodologies.

---

[26] Fannie Mae, to which the Gardiner Appraisal Services affidavit refers, also requires the inspection of the interior and exterior of a building for an appraisal. See Fannie Mae, "Appraisal and Property Report Policies and Forms Frequently Asked Questions (FAQs)" at 4.

Assessors are obligated to follow what is known as the Markarian three-tier hierarchy to value real property.[27] See State ex rel. Markarian v. City of Cudahy, 45 Wis. 2d 683, 173 N.W.2d 627 (1970). The hierarchy set forth in § 70.32(1) and case law is as follows.

¶159 First tier: An assessor must base the assessment of the subject property on a recent arm's-length sale of the property, if available.[28] This is perhaps the only assessment methodology that does not rely on data gleaned from an actual view of the real property.

¶160 Of course, a recent arm's-length sale ordinarily represents a consideration by the buyer of the interior and exterior of the real property. Rational prospective homebuyers would inspect the real property and not simply rely on a seller's representations of the home, the record of permits pulled for the home, or the assessed value of similar properties.

---

[27] "'An assessor has an obligation to follow the three tier assessment analysis.'" Regency West Apartments LLC v. City of Racine, 2016 WI 99, ¶26, 372 Wis. 2d 282, 888 N.W.2d 611 (quoting Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶47, 294 Wis. 2d 441, 717 N.W.2d 803). See also Wisconsin Property Assessment Manual at ch. 9.

[28] See Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶34, 294 Wis. 2d 441, 717 N.W.2d 803 ("Evidence of an arms-length sale of the subject property is the best evidence of true cash value.") (citing State ex rel. Keane v. Bd. of Review, 99 Wis. 2d 584, 590, 299 N.W.2d 638 (Ct. App. 1980)).

¶161 Second Tier: If the subject property was not recently sold, an assessor must base the assessment of the subject property on sales of reasonably comparable property.

¶162 The sales comparison approach is "based on the premise that similar properties will sell for similar prices on the open market." Wisconsin Property Assessment Manual at 9-24. The Manual requires using the sale price of properties that are "similar to the subject property in age, condition, use, type of construction, location, design, physical features and economic characteristics." Wisconsin Property Assessment Manual at 9-24. An important consideration in determining whether properties are comparable is the improvements.[29]

¶163 Third Tier: If no sales of reasonably comparable properties are available, an assessor may assess the subject property using other assessment methodologies, such as cost and income.[30] In assessing under this tier, an assessor may consider

---

[29] Rosen v. City of Milwaukee, 72 Wis. 2d 653, 686, 242 N.W.2d 681 (1976) ("Important considerations in determining whether particular property is sufficiently similar to the property being assessed to warrant reliance on its sale price as evidence of market value include its location, including the distance from the assessed property, its business or residential advantages or disadvantages, its improvements, size and use.").

[30] See, e.g., Adams Outdoor Advert., Ltd. v. City of Madison, 2006 WI 104, ¶34, 294 Wis. 2d 441, 717 N.W.2d 803 ("Only if there has been no arms-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies.") (citing State ex rel. Keane v. Bd. of Review, 99 Wis. 2d 584, 590, 299 N.W.2d 638 (Ct. App. 1980)); Great Lakes Quick Lube, LP v. City of Milwaukee, 2011 WI App 7, ¶¶17-18, 331 Wis. 2d 137, 794 N.W.2d 510 (citing Allright Props., Inc. v. City of Milwaukee, 2009 WI App 46, ¶11, 317 Wis. 2d 228, 767 N.W.2d 567).

21

"all the factors collectively which have a bearing on value of the property in order to determine its fair-market value." Markarian, 45 Wis. 2d at 686. Gardiner Appraisal Services asserts that without accurate information from an interior view of the real property, it "is not possible to do an accurate cost, market, or income approach to valuation."

¶164 A final direction to assessors comes from case law interpreting Wis. Stat. § 70.32(1) and its precursors. The court has recognized that the legislature has expressed a preference for assessments based on an actual view of the real property and that the legislature has also concluded that valuation requires attention to other enumerated statutory factors and requires the judgment and expertise of the assessor.

¶165 In the 1860s, the precursor to Wis. Stat. § 70.32(1) referred to an "actual view" and enumerated various factors to be considered in valuation, including "all buildings" and "improvements of every description thereon."[31] The disjunctive

---

[31] See Wis. Stat. ch. 18, § 31 (1871) (cited in March v. Board of Supervisors, 42 Wis. 502 (1877)). This statute states that real property shall be valued by the assessor from actual view and does not mention an alternative "best information" but enumerates factors to be considered. It provides as follows:

§ 31. Real property shall be valued by the assessor from actual view at the full value which could ordinarily be obtained therefor at private sale, and which the assessor shall believe the owner, if he desires to sell, would accept in full payment. In determining the value the assessors shall consider as to each piece, its advantage or disadvantage of location, quality of soil, quantity and quality of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and all buildings, fixed machinery

(continued)

22

phrase "or from the best information that the assessor can practicably obtain" was later added to the statute.[32]

¶166 In considering the statute that included the disjunctive phrase, the court accepted the idea that the legislature expressed a preference for an actual view. The court did not, however, invalidate the assessment when the assessor failed to undertake an actual view. The court acknowledged that "[i]t may be that a valuation from actual view is always possible, but it is not always practicable." Boorman

and improvements of every description thereon, and their value. Real property held under lease from any religious, scientific, literary or benevolent association, but otherwise exempt, shall be assessed to the lessee. The assessor having fixed the value shall enter the same opposite the proper tract in the assessment roll. Property omitted from assessment the previous year by mistake, shall be entered twice, designating one entry as omitted for the year 18——. (Emphasis added.)

[32] See Wis. Stat. ch. 48, § 1052 (1889), which provides as follows:

Real property shall be valued by the assessor either from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value the assessor shall consider, as to each piece, its advantage or disadvantage of location, quality of soil, quantity of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value. Real property held under lease from any religious, scientific, literary or benevolent association, but otherwise exempt, shall be assessed to the lessee. The assessor, having fixed the value, shall enter the same opposite the proper tract or lot in the assessment roll. (Emphasis added.)

v. Juneau County, 76 Wis. 550, 553, 45 N.W. 675 (1890). The Boorman court surmised that the assessor was acquainted with the property from prior years.[33]

¶167 In sum, Wis. Stat. § 70.32(1) addresses and provides direction to assessors regarding the methodology of valuation. With its explicit reference to "actual view"; its references to the Wisconsin Property Assessment Manual, "professionally acceptable appraisal practices," and the hierarchy of assessment methodologies; and its longstanding judicial interpretation, Wis. Stat. § 70.32(1) suggests a preference for actual view in an assessment——meaning interior and exterior view——and at the same time empowers assessors to use their judgment and expertise within the parameters set forth in the statute.

¶168 The lead opinion's narrow, either/or reading of Wis. Stat. § 70.32(1) breaches a contextual reading and breaks with precedent. The lead opinion's allowing the property owner in effect to dictate the valuation methodology impairs the functioning of the tax assessment system.

¶169 Because the legislature has established a preference for an actual view in valuation of real property, the legislature has also attempted to influence a property owner to

---

[33] More recently, the court of appeals concluded that an actual view was not required to conduct a comparable sales analysis because the village assessor had been familiar with the subject properties for 14 years. State ex rel. Kesselman v. Bd. of Review, 133 Wis. 2d 122, 133, 394 N.W.2d 745 (Ct. App. 1986). In Kesselman, "[t]he circuit court found that the assessor failed to use the 'best information' available . . . because he used only a drive-by inspection . . . ." Kesselman, 133 Wis. 2d at 126-27.

permit an assessor an actual view of the real property. Indeed, the legislature's decision to induce real property owners to permit an assessor's actual view supports the proposition that the legislature prefers that assessors have an actual view of the real property.

### III

¶170 To advance the significant, legitimate governmental objective of uniformity and equity, the legislature has provided a reasonable, constitutional inducement to property owners to consent to an assessor's actual view of the real property: The legislature imposes a reasonable, constitutional limit on the ability of a property owner to contest the amount of an assessment if the property owner prevents the assessor from having an actual view of the real property.

¶171 I turn to the state constitutional requirement of uniformity. The Uniformity Clause of the Wisconsin Constitution dates back to the 1848 Constitution. It provides in relevant part that "[t]he rule of taxation shall be uniform but the legislature may empower cities, villages or towns to collect and return taxes on real estate located therein by optional methods. . . . " Wis. Const. art. VIII, § 1. See lead op., ¶3.

¶172 The Uniformity Clause requires that taxes be fairly allocated among taxpayers. Comparable properties in the district are to be assessed uniformly.[34] "The purpose of the

---

[34] Clear Channel Outdoor, Inc. v. City of Milwaukee, 374 Wis. 2d 348, ¶37, 374 Wis. 2d 348, 893 N.W.2d 24 (quoting U.S. Oil Co., Inc. v. City of Milwaukee, 2011 WI App 4, ¶25, 331 Wis. 2d 407, 794 N.W.2d 904 (2010)).

Uniformity Clause is to ensure the tax burden is allocated proportionally to the value of each person's property." Lead op., ¶47.

¶173 The Uniformity Clause requires the same measuring stick to be applied to comparable properties. "Satisfying the Uniformity Clause requires . . . a uniform method of determining the value of [] property . . . . " Lead op., ¶48.

¶174 The valuation of real property depends to a large extent on the condition and quality of both the exterior and interior of the real property. Thus, the requirement of an actual view strongly relates to the state constitutional requirement of uniformity.

¶175 Inaccuracy in the assessment of a parcel of real property may result in inaccurate, and potentially unjust, tax assessments of other real properties in that taxing jurisdiction. See lead op., ¶¶47-48; Noah's Ark Family Park v. Bd. of Review, 210 Wis. 2d 301, 310-12, 565 N.W.2d 230 (Ct. App. 1997) (Ct. App. op. adopted as op. of the Wisconsin Supreme Court, 216 Wis. 2d 387, 390, 394, 573 N.W.2d 852 (1998)).

¶176 The lead opinion asserts that the Town "contradict[s] itself" by arguing that the Uniformity Clause requires an "actual view" and then nevertheless proceeds to assess the Milewski real property using other assessment methodologies. Lead op., ¶51. The lead opinion concludes that "[i]f proceeding under this alternative was not consistent with the Uniformity Clause, then the Town indicts itself for violating the constitution . . . ." Lead op., ¶51.

26

¶177 The lead opinion stumbles. The Town's argument is not contradictory: Once the Town proceeded to assess real property using an "actual view," it applied the same methodology throughout the Town complying with the Uniformity Clause and the revaluation process. The Milewskis prevented the use of the same methodology for their property. When the Milewskis refused to allow the assessor an actual view of the real property, they prevented the Town from complying with the mandate under the Uniformity Clause to apply a uniform method of valuation. They prevented the Town from treating similarly situated property owners similarly. The Town had no choice but to use a different method for valuing the Milewskis' real property.

¶178 The Town must nevertheless assess the Milewskis' property. The Milewskis cannot escape assessment and taxation by refusing to allow the assessor to view the interior of the real property. To assess the Milewskis' real property, the Town was forced to use the "best information that the assessor [could] practicably obtain" in accordance with Wis. Stat. § 70.32(1).

¶179 To achieve even-handedness among real property owners when a property owner refuses to allow an assessor an actual view of the real property, the legislature imposes reasonable, constitutional restrictions on the ability of property owners to contest the amount of an assessment. The Town of Dover describes achieving this goal of even-handedness among real property owners in terms of avoiding the "free-rider" as follows:

27

If most homeowners allow the assessor into their homes to get an accurate assessment, but some homeowners are allowed to force the assessor to make his or her assessment without that crucial information and are still allowed to try to decrease their assessment by challenging it in other respects, the probable consequence is that wealthy homeowners will be able to avoid paying their fair share of taxes by hiding their interior improvements.[35]

¶180 Unless the assessor has access to the interior of the real property, the taxing entity is at a significant disadvantage in justifying its assessment when challenged by the property owner.

¶181 When a property owner challenges an assessment, there is a rebuttable presumption that the assessment is correct.[36] If the property owner shows that the assessor has not adhered to the statutes or the property owner presents significant contrary evidence that establishes it is more probable than not that the assessed value is not correct, the presumption ceases to apply.[37]

¶182 In the instant situation, the property owners (and their expert) know the interior of the real property but the Town (and its expert) do not. If the Town does not have evidence regarding the interior of the real property, the Town

---

[35] Brief of Defendant-Respondent Town of Dover and Board of Review for the Town of Dover at 17.

[36] Walgreen Co. v. City of Madison, 2008 WI 80, ¶17, 311 Wis. 2d 158, 752 N.W.2d 687; Adams Outdoor Advertising, Ltd. v. City of Madison, 2006 WI 104, ¶26, 294 Wis. 2d 441, 717 N.W.2d 803.

[37] Wis. Stat. § 70.47(13); Bonstores Realty One, LLC v. City of Wauwatosa, 2013 WI App 131, ¶9, 351 Wis. 2d 439, 839 N.W.2d 893 (citing Wis. Stat. § 903.01 for the proposition that an evidentiary presumption shifts the burden to the challenger).

28

cannot rebut the property owners' evidence. To avoid this situation, the legislature has restricted the property owner's ability to contest the amount of the assessment if the property owner refuses the assessor an actual view.

¶183 According to the lead opinion, a property owner can, without any adverse consequences, refuse an assessor an actual view of the real property and apparently can still contest the amount of the assessment. The result is two-fold: (1) The property owner and the Town (which represents all property owners) are not on an equal, fair, level "playing field" in debating the amount of the assessment; and (2) the decision maker will not have the full information that the assessor could provide (if he or she had an actual view) upon which to determine the amount of the assessment. As the court of appeals concluded, "[t]he interior view of the home is one of the most important pieces of evidence that the tax assessor must consider when making an assessment. No other means are as effective to provide an accurate valuation." Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op., ¶19 (Wis. Ct. App. May 4, 2016).

¶184 An assessment decision resting on only one side's (the property owner's) presentation of evidence relating to the interior of the property is very apt to be erroneous. The law recognizes the importance of a decision's being based on full

and complete information.[38]   Restricting the ability of a property owner who refuses the assessor an actual view to contest the amount of the assessment is thus necessary to assure that both the property owner and the taxing entity have equal access to material information and that the decision maker has this information to enable it to establish a just and equitable assessment.

¶185 The lead opinion asserts that the Milewskis may suffer adverse consequences, "substantial impediments," and "evidentiary consequences" as a result of refusing the assessor an actual view, but the lead opinion does not reveal them; they are kept a secret, not to be divulged by the lead opinion.  See lead op., ¶26 n.11.  See also my discussion in Part VI of this dissent, asserting that the meaning of the mandate is clandestine.

¶186 Of course, the legislature could have chosen a different path to restrict the non-consenting property owner's rights to contest the amount of an assessment.  For example, the legislature could have permitted the non-consenting property owner to appear before the board to contest the amount of the assessment but could have barred him or her from submitting any evidence relating to the interior of the real property.

_____

[38] See, e.g., Elias v. State, 93 Wis. 2d 278, 285, 286 N.W.2d 559 (1980) ("The responsibility of the sentencing court is to acquire full knowledge of the character and behavior pattern of the convicted defendant before imposing [the] sentence.").

¶187 Without such evidence, in all likelihood, the non-consenting property owner's challenge to the amount of the assessment would be dismissed. The result would be the same as the legislature's simply barring from the outset the non-consenting property owner from contesting the amount of the assessment. The legislature's decision to bar a non-consenting property owner from contesting the amount of the assessment is different in form, but not in substance, from barring a non-consenting property owner from introducing evidence. The legislature has made a sound, constitutional policy choice that this court should not overturn.

¶188 In sum, an interior (and exterior) view of real property (an actual view) is germane to, and has an extremely powerful nexus with, valuation and assessment. The legislature has a strong interest in inducing real property owners to consent to an assessor's actual view of the real property and to treat property owners who do consent differently in contesting the amount of an assessment from property owners who do not consent. The challenged statutes compellingly relate to the governmental interest of uniform taxation and fairness to all property owners.

¶189 With the robust government interest in uniformity and fairness in mind, I examine the Fourth and Fourteenth Amendments.

¶190 To recap, according to the lead opinion, the statutes force an unconstitutional choice on property owners: On the one hand, consent to an assessor's viewing the interior of a home

31

(relinquishing a protected Fourth Amendment right) and retain the right to a hearing in which to contest the amount of the assessment (a procedural due process right), and on the other hand, refuse to consent to an assessor's viewing the interior of a home (maintaining a protected Fourth Amendment right) and relinquish the right to a hearing in which to contest the amount of the assessment (relinquishing a procedural due process right). I disagree with this portrayal of a constitutional dilemma.

¶191 As noted above, there was no search, and the Milewskis have had due process hearings in which they have asserted their challenge to the assessment and the statutes.

¶192 Moreover, the touchstone of the Fourth Amendment is reasonableness. Brigham City v. Stuart, 547 U.S. 398, 403 (2006). Not all searches violate the Fourth Amendment, only unreasonable ones. The determination of whether a particular search is reasonable must be made by "balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." Delaware v. Prouse, 440 U.S. 648, 654 (1979).[39]

¶193 Recently, the United States Supreme Court explained the reasonableness standard in Fourth Amendment jurisprudence

---

[39] Ohio v. Robinette, 519 U.S. 33, 39 (1996) ("Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances."); State v. Gaulrapp, 207 Wis. 2d 600, 607, 558 N.W.2d 696 (Ct. App. 1996) ("[T]he Fourth Amendment's touchstone is reasonableness, which is measured in objective terms by examining the totality of the circumstances.").

32

and the balancing of the intrusion and the governmental interests as follows:

> Borrowing from our Fifth Amendment jurisprudence, the United States suggests that motorists could be deemed to have consented to only those conditions [a blood draw] that are "reasonable" in that they have a "nexus" to the privilege of driving and entail penalties that are proportional to severity of the violation. Brief for United States as Amicus Curiae 21-27. But in the Fourth Amendment setting, this standard does not differ in substance from the one that we apply, since reasonableness is always the touchstone of Fourth Amendment analysis, see Brigham City v. Stuart, 547 U.S. 398, 403, 126 S. Ct. 1943, 164 L. Ed. 2d 650 (2006). And applying this standard, we conclude that motorists cannot be deemed to have consented to submit to a blood test on pain of committing a criminal offense.

Birchfield v. North Dakota, 136 S. Ct. 2160, 2186 (2016).

¶194 The challenged statutes do not require a property owner to relinquish a Fourth Amendment right by permitting an assessor's entry into the home.

¶195 Rather, the statutes offer the property owner an incentive, an inducement, to consent to an assessor's entry into the home. An entry in the home is an intrusion. But the level of intrusion for tax assessment purposes is less of an intrusion on personal privacy and dignity than other searches.

¶196 A tax assessor would not be rummaging through a real property owner's personal effects, file cabinets, computers, closets, medical cabinets, drawers, locked cabinets or other private materials not germane to valuing the physical attributes of the real property. Moreover, the amount of time taken by an assessor to view the home is ordinarily much shorter than the time taken in a search conducted in the course of a criminal

33

investigation.[40]  In an assessment search, the property owner is not singled out as the object of official suspicion.  Nothing is seized.  The property owner is given advance notice and the entry is at a convenient time for the property owner.  The property owner may remove or conceal any personal effects before the assessor arrives.

¶197 The legislature's inducement to obtain the property owner's consent to the assessor's entry is to require the non-consenting property owner to forgo a hearing at which the owner may contest the amount of the assessment.  The inducement is more than reasonable in light of the governmental interests involved.

¶198 In examining the procedural due process issue the lead opinion raises, I note that the touchstone of procedural due process is that due process is "flexible and requires only such procedural protections as the particular situation demands."[41] "Since the time of [its] early explanations of due process," the

---

[40] "[T]he purpose for the [governmental] interference bears upon the intrusiveness of government action.  A criminal investigation is generally more intrusive than an administrative or regulatory investigation . . . ."  Widgren v. Maple Grove Twp., 429 F.3d 575, 584 (6th Cir. 2005) (citing 5 Wayne R. LaFave et al., Search and Seizure:  A Treatise on the Fourth Amendment § 10.1(b) (4th ed. 2004)).

[41] State ex rel. Strykowski v. Wilkie, 81 Wis. 2d 491, 512, 261 N.W.2d 434, 444 (1978) ("[D]ue process is satisfied if the statutory procedures provide an opportunity to be heard in court at a meaningful time and in a meaningful manner. . . .  Due process is flexible and requires only such procedural protections as the particular situation demands.") (citing Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).

United States Supreme Court has "understood the core of the concept to be protection against arbitrary action."[42] The challenged statutes are not arbitrary; they are reasonable and germane to significant governmental interests.

¶199 As discussed above, the parties will not be on an equal footing at a hearing to determine the assessment if the Town will not have information about the interior of the real property to defend its assessment. The decision maker will not have the benefit of full information upon which to establish an assessment. The non-consenting property owner may thus be able to distort its assessment to the detriment of the other property owners and to impinge on the Town's ability to comply with the Uniformity Clause.

¶200 The legislative restriction upon the Milewskis' right to contest the amount of the assessment is more than reasonable under the circumstances. The statutes do not impose an arbitrary restriction on the property owner and do not violate due process. Considering the countervailing governmental interest in uniform taxation, the challenged statutes do not constitute government action arbitrarily limiting the Milewskis' due process rights.

¶201 In sum, bearing in mind the interests of the real property owner and the public, I conclude that the options the

_____

[42] Cty. of Sacramento v. Lewis, 523 U.S. 833, 845 (1998); accord Wolff v. McDonnell, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government.").

legislature offered to the Milewskis do not impair, to an appreciable extent, the rights involved and do promote, to an appreciable extent, weighty governmental interests.

IV

¶202 I conclude that the options the legislature offers the property owner are constitutionally sound government-imposed "tough" choices. I analogize the challenged statutes to Wisconsin's Implied Consent Law, Wis. Stat. § 343.305.

¶203 Tough choices, even choices that discourage the exercise of a Fourth Amendment right, are common in the law and are viewed as voluntary and constitutionally valid:

> The criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow. Although a defendant may have a right, even of constitutional dimensions, to follow whichever course he chooses, the Constitution does not by that token always forbid requiring him to choose.[43]

The lead opinion apparently refuses to accept that such a choice is valid. See, e.g., lead op., ¶68 n.29.

¶204 In Wisconsin's Implied Consent Law, the State imposes a choice on drivers. The choice has the effect of discouraging

---

[43] McGautha v. California, 402 U.S. 183, 213 (1971), reh'g granted, judgment vacated sub nom. Crampton v. Ohio, 408 U.S. 941 (1972) (internal quotation marks and citations omitted) ("The contention is that where guilt and punishment are to be determined by a jury at a single trial the desire to address the jury on punishment unduly encourages waiver of the defendant's privilege to remain silent on the issue of guilt, or, to put the matter another way, that the single-verdict procedure unlawfully compels the defendant to become a witness against himself on the issue of guilt by the threat of sentencing him to death without having heard from him.").

36

the exercise of a Fourth Amendment right to be free from a government search of a person's body. The Wisconsin Implied Consent Law is constitutional.[44]

¶205 Under the Wisconsin Implied Consent Law, a driver faces the "difficult choice" between consenting to a blood draw or refusing to consent to a blood draw and facing revocation of the driver's license and the prosecution's use of "refusal evidence" at trial.[45] See State v. Padley, 2014 WI App 65, ¶27, 354 Wis. 2d 545, 849 N.W.2d 867.[46] A blood draw is a search

---

[44] See Missouri v. McNeely, 133 S. Ct. 1552, 1566 (2013) ("States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to BAC testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense."); Birchfield, 136 S. Ct. at 2185 ("Our prior opinions have referred approvingly to the general concept of implied-consent laws that impose civil penalties and evidentiary consequences on motorists who refuse to comply . . . and nothing we say here should be read to cast doubt on them.").

[45] The use of refusal evidence at trial has been held not to violate due process. North Dakota v. Neville, 459 U.S. 553 (1983); State v. Albright, 98 Wis. 2d 663, 298 N.W.2d 196 (Ct. App. 1980); State v. Crandall, 133 Wis. 2d 251, 394 N.W.2d 905 (1986).

[46] Although the Implied Consent Law seeks waiver of a Fourth Amendment right in exchange for retaining the "privilege of an operator's license," and, according to the lead opinion, the tax assessment system seeks waiver of a Fourth Amendment right in exchange for retaining a due process right to challenge the assessment, the analogy is apt.

(continued)

37

under the Fourth Amendment. It is "an invasion of bodily integrity" and "implicates an individual's most personal and deep-rooted expectations of privacy." Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013) (internal quotation marks and quoted source omitted).

¶206 The Wisconsin property tax assessment system is, in many ways, strikingly similar to Wisconsin's Implied Consent Law. An entry into a home, like a blood draw, implicates significant privacy concerns; both are intrusions restricted by the Fourth Amendment. Both the tax assessment system and the Implied Consent Law impose civil consequences, not criminal consequences, if the individual exercises his or her Fourth

---

The United States Supreme Court has not distinguished between a privilege and a right for these purposes. See, e.g., Sherbert v. Verner, 374 U.S. 398, 404 (1963) ("Nor may the South Carolina court's construction of the statute be saved from constitutional infirmity on the ground that unemployment compensation benefits are not appellant's 'right' but merely a 'privilege.' It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege."); Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972) ("[T]he Court has fully and finally rejected the wooden distinction between 'rights' and 'privileges' that once seemed to govern the applicability of procedural due process rights."); Graham v. Richardson, 403 U.S. 365, 374 (1971) ("But this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'"); Kerry v. Din, 135 S. Ct. 2128, 2143 (2015) (Breyer, J., dissenting) ("Justice SCALIA's response——that nonconstitutional law creates an 'expectation' that merits procedural protection under the Due Process Clause only if there is an unequivocal statutory right,——is sorely mistaken. His argument rests on the rights/privilege distinction that this Court rejected almost five decades ago, in the seminal case of Goldberg v. Kelly, 397 U.S. 254, 262, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970).").

Amendment constitutional right to refuse to consent to the search.[47]

¶207 And although the Fourth Amendment right to refuse a blood draw or a home entry can be exercised, the exercise comes with civil statutory consequences. The civil consequences are supported by strong governmental interests. Implied consent laws serve the paramount governmental interest of enforcing drunk-driving laws and, thus, protecting public safety.[48] The tax assessment system serves the paramount government interest of raising funds and ensuring uniform and fair taxation.

¶208 Considering the apt analogy between Wisconsin's Implied Consent Law and the Wisconsin tax assessment system, I agree with the court of appeals' reasoning in the instant case upholding the constitutionality of the statutory choice imposed on the Milewskis:

> Here, Plaintiffs have the "right" to refuse to allow
> Gardiner access to their home, but the consequence

---

[47] See Birchfield v. North Dakota, 136 S. Ct. 2160, 2185 (2016) ("It is another matter, however, for a State not only to insist upon an intrusive blood test, but also to impose criminal penalties on the refusal to submit to such a test. There must be a limit to the consequences to which motorists may be deemed to have consented by virtue of a decision to drive on public roads."); Camara v. Mun. Ct., 387 U.S. 523, 540 (1967) ("We therefore conclude that appellant has a constitutional right to insist that the inspectors obtain a warrant to search and that appellant may not constitutionally be convicted [of a crime] for refusing to consent to the inspection.") (emphasis added).

[48] See Birchfield, 136 S. Ct. at 2173 ("The States and the Federal Government have a paramount interest . . . in preserving [public highway] safety . . . .") (internal quotation marks and quoted source omitted).

that flows from the refusal is cessation of the right to challenge the tax assessment and pay without recourse. There is no due process violation; the choice belongs entirely to Plaintiffs.[49]

V

¶209 Another way of depicting the unexceptional aspects of the challenged tax assessment statutes is to analogize them to the unremarkable principle of tax law that a taxpayer must make full disclosure to a taxing authority or face civil tax consequences for failing to divulge information to the taxing authority. The consequence for refusing an assessor's reasonable request for an interior view is not retaliatory or punitive. Rather it is a legal, logical extension of the usual rule that a taxpayer who has material information about his or her tax matters must divulge it to the taxing authority.

¶210 The United States Supreme Court explained this principle in Wyman v. James, 400 U.S. 309, 404 (1971). In Wyman, the Court explained that disallowing a deduction (which increased the tax, a taking of property according to the lead opinion) was a valid consequence for the taxpayer's refusal to submit proof substantiating the claimed deduction:

> [In a federal income tax dispute between a taxpayer and an IRS agent] an Internal Revenue Service agent, in making a routine civil audit of a taxpayer's income tax return, asks that the taxpayer produce for the agent's review some proof of a deduction the taxpayer has asserted to his benefit in the computation of his tax. If the taxpayer refuses, there is, absent fraud, only a disallowance of the claimed deduction and a consequent additional tax. The taxpayer is fully

---

[49] Milewski v. Town of Dover, No. 2015AP1523, unpublished slip op., ¶21 (Wis. Ct. App. May 4, 2016).

within his "rights" in refusing to produce the proof, but in maintaining and asserting those rights a tax detriment results and it is a detriment of the taxpayer's own making. . . . [N]othing of constitutional magnitude is involved.

Wyman, 400 U.S. at 389.

¶211 Similarly, this court has confirmed that "the privilege of appearing before the board of review and having assessment errors corrected is coupled with a duty of the taxpayer to make full disclosure of information." Hermann v. Town of Delavan, 215 Wis. 2d 370, 393, 572 N.W.2d 855 (1998) (citing Wis. Stat. § 70.47(7)(a)).[50]

¶212 Wisconsin Stat. § 70.47(7)(a) explicitly disallows a person "to question [in any action or proceeding] the amount or valuation of property unless . . . [the person] made full disclosure before said board, under oath of all that person's property liable to assessment . . . and the value thereof." Similarly, Wis. Stat. § 70.47(7)(af) states that no person may object to a valuation if that valuation was made by the assessor using the income method unless the person supplies to the

---

[50] In Hermann v. Town of Delavan, 215 Wis. 2d 370, 376, 572 N.W.2d 855, a group of taxpayers brought a claim under Wis. Stat. § 893.80 alleging that the Town's method of assessment was unfair and non-uniform. Because the taxpayers' complaint did not allege their prior compliance with the property tax appeal procedures set forth in Wis. Stat. § 70.47, this court affirmed the circuit court's dismissal of the taxpayers' complaint for failing to state a claim for upon which relief could be granted; the taxpayers had failed to exhaust the exclusive statutory remedies addressing their overassessment claims, so their claims were dismissed. Hermann, 215 Wis. 2d at 377.

assessor all of the information about income and expenses that the assessor requests.[51]

¶213 At the turn of the last century, Wisconsin Supreme Court Justice Joshua Eric Dodge eloquently explained the rationale behind the principle that the taxpayer who has information must disgorge the information (to which the taxing authority does not have access) in order to challenge the assessment, to ensure that the property owner and the taxing entity have a "level playing field" before the decision maker so that the decision maker can allocate the burden of taxation fairly:

> [The taxing authority] and the public are entitled that [the taxing authority] shall not be successfully attacked in court without full and frank disclosure from the taxpayer of the superior knowledge which he necessarily has upon the subject. It is perhaps utopian to expect of human selfishness voluntary original information . . . , but when one presents himself to give evidence against the amount which the assessor has fixed in the light, or obscurity, which necessarily surrounds him, it is but right that the taxpayer furnish all the enlightenment in his power without evasion or concealment. . . .

---

[51] The legislature has barred taxpayers from challenging tax assessments for personal property if the taxpayer failed to make full disclosure. See, e.g., Vill. of Westby v. Bekkedal, 172 Wis. 114, 121-22, 178 N.W. 451, 454 (1920) (taxpayer who did not comply with statutory requirement to attend hearing and disclose all income subject to assessment was estopped from challenging the assessment); State ex rel. Foster v. Williams, 123 Wis. 73, 75, 100 N.W. 1052, 1052 (1904) (1903 Wis. Laws ch. 284, § 2, barred the taxpayer from questioning the board's valuation unless the taxpayer made full disclosure before the board, under oath, of all his or her personal property liable to assessment in the district and the value thereof; holding that evasive answers do not constitute a full disclosure).

State ex rel. Foster v. Williams, 123 Wis. 73, 76-77, 100 N.W. 1052, 1053 (1904).

¶214 By refusing to permit the assessor an interior view of the real property, the property owner fails to make a full disclosure to the taxing entity. Because the property owner fails to make full disclosure, the owner is restricted from contesting the amount of the assessment. By holding the challenged statutes unconstitutional as applied, the lead opinion essentially eviscerates the longstanding full disclosure rule, to the detriment of uniformity and fairness.[52]

---

[52] Less persuasive, but worth mentioning as some support for the constitutionality of the challenged statutes, is that the challenged statutes may be considered analogous to several prerequisites a property owner must meet to contest the assessment:

- Wis. Stat. § 70.47(7)(a): A person who owns land and improvements to that land may not object only to the valuation of that land or only to the valuation of improvements to that land.

- Wis. Stat. § 74.37(4)(b): No claim or action for an excessive assessment may be brought or maintained unless the tax for which the claim is filed is timely paid.

- Wis. Stat. § 74.3(4)(c): No claim or action for an excessive assessment may be brought or maintained if the assessment of the property for the same year is contested under enumerated sections of chapter 70.

- The real property owner must exhaust administrative remedies. See Northbrook Wis., LLC v. City of Niagara, 2014 WI App 22, ¶25, 352 Wis. 2d 657, 843 N.W.2d 851 ("That Northbrook failed to avail itself of the opportunity to object before the Board of Review does not mean its right to due process was violated.").

¶215 In the instant case, the legislature has given notice to property owners that it deems an assessor's actual view of real property material evidence and that the property owners' failure to produce this material evidence will result in restricting the property owners' right to contest the amount of the assessment. By failing to permit an interior view of the real property, property owners cannot at the same time take advantage of the law's protection of the information and use the information to seek an advantage against an opposing person (including a government entity) that does not otherwise have access to the information.

¶216 The full disclosure rule exists outside of tax law. For example, if a plaintiff claiming damages for personal injury refuses to disclose his or her otherwise confidential medical

records, the plaintiff's claim will be dismissed.[53]  See Wis. Stat. § 804.10, 905.04(4)(c).[54]

¶217 The challenged statutes are, in a sense, a corollary of the well-accepted legal principle that persons who fail to disclose material evidence that is in their possession and that is not readily available to an opposing party may not avail themselves of a judicial forum.

VI

¶218 I conclude by probing the meaning of the mandate of the lead opinion.

¶219 The lead opinion remands the matter to the circuit court "for further proceedings consistent with this opinion." Nowhere does the lead opinion discuss the further proceedings;

---

[53] Lister v. Sure-Dry Basement Sys., 2008 WI App 124, 313 Wis. 2d 151, 758 N.W.2d 126 (dismissal of homeowner's action against contractor was warranted for homeowner's failure to supply physician's report); Steinberg v. Jensen, 194 Wis. 2d 439, 480, 534 N.W.2d 361 (1995) (Geske, J. concurring) ("Clearly, once a patient-litigant puts his or her physical, mental, or emotional condition into issue in a lawsuit, any confidential physician-patient communications relating to that issue, including those relevant to discovery under ch. 804, Stats., are not privileged."); Khalsa v. Chose, 261 P.3d 367 (Alaska 2011) (affirming dismissal of personal injury claim for plaintiff's failure to turn over medical records despite prior warning and court order).

[54] Wisconsin Stat. § 905.04(4)(c) provides:  "There is no privilege under this section as to communications relevant to or within the scope of discovery examination of an issue of the physical, mental or emotional condition of a patient in any proceedings in which the patient relies upon the condition as an element of the patient's claim or defense, or . . . in any proceeding in which any party relies upon the condition as an element of the party's claim or defense."

45

it is not clear what the lead opinion has in mind. See lead op., ¶26 ("We express no opinion on whether the Milewskis will be able to carry their burden of proof upon the contest of the Property's value, but that has nothing to do with whether they have the right to hazard the attempt.").

¶220 Does the circuit court determine the assessment? Does the circuit court remand the matter to the Town Board of Review to determine the assessment? May the Milewskis hire an appraiser at their own expense to view the interior of their home and submit that appraiser's opinion to the board of review or circuit court?

¶221 The Milewskis' brief provides no help in advising what happens should they prevail in this court. The brief seeks merely a declaration that Wis. Stat. §§ 70.47(7)(aa) and 74.37(4)(a) together violate their constitutional rights and this court's reversal of the decision of the court of appeals.

¶222 The assessor's brief concludes that, should the Milewskis prevail in this court, their remedy should be a remand of the matter to the Town Board of Review to determine the assessment. The assessor proposes this remedy because the Milewskis' challenge to the amount of the assessment was not heard by the Board and the statutory procedures require the matter be heard first by the Board. Citing Hermann v. Town of Delavan, 215 Wis. 2d 370, 381-83, 572 N.W.2d 855 (1998), the assessor argues that Chapters 70 and 74 are intended to be the exclusive means by which the property owner may contest the amount of the assessment.

¶223 Along the same lines, the Town urges that, should it lose, "the remedy should be an opportunity to challenge the assessment before the" board of review. But the Town adds that the Milewskis should not have the opportunity to "use any information that they have withheld, i.e., regarding the interior of the home."

¶224 Whether the circuit court or the Board of Review determines the assessment, I agree with the Town and the assessors that neither the Milewskis nor any of their witnesses should be able to use any information that they have regarding the interior of the real property. Their challenge to the assessment should be limited to the assessor's calculation of the value of the real property. Without this limit on the Milewskis' challenge to the assessment of their property, the Town's duty to assess real property uniformly and fairly may become a nullity.

¶225 For the reasons set forth, I write separately in dissent.

¶226 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.